**ERI CONSULTING ENGINEERS, INC. and Larry G. Snodgrass, Petitioners,**

v.

**J. Mark SWINNEA, Brady Environmental, Inc., and Malmeba Company, Ltd., Respondents.**

No. 07–1042.

Supreme Court of Texas.

Argued Dec. 17, 2009.

Decided May 7, 2010.

Rehearing Denied Oct. 1, 2010.

Sarah B. Duncan, Elissa Gail Underwood, Mike A. Hatchell, Susan A. Kidwell, Locke Lord Bissell & Liddell, LLP, Austin, TX, Deborah J. Race, Ireland Carroll & Kelley, P.C., Roger W. Anderson, Gillen & Anderson, Tyler, TX, for Petitioners.

Gregory D. Smith, S. Justin Lindley, Ramey & Flock, P.C., Tyler, TX, Sheral Kniffin Maloy, El Paso, TX, for Respondents.

Justice GREEN delivered the opinion of the Court.

The principal question in this case is whether consideration received for the sale of a business interest is subject to equitable forfeiture as a remedy for breach of fiduciary duty. We hold that when a partner in a business breached his fiduciary duty by fraudulently inducing another partner to buy out his interest, the consideration received by the breaching party for his interest in the business is subject to forfeiture as a remedy for the breach, in addition to other damages that result from the tortious conduct. Here, the trial court ordered equitable forfeiture, but the court of appeals reversed, concluding that forfeiture was not an available remedy. We reverse the court of appeals' judgment in part and remand the case to that court for further proceedings consistent with this opinion.

## I. Facts

Larry G. Snodgrass and J. Mark Swinnea owned equal interests in two business entities, ERI Consulting Engineers, Inc., and Malmeba Company, Ltd., which they operated together for approximately ten years. ERI is a small consulting company that manages asbestos abatement projects for contractors. It leased office space from Malmeba, a partnership that owned the building.

Snodgrass and ERI purchased Swinnea's interest in ERI in 2001. ERI paid Swinnea $497,500 to redeem Swinnea's ERI stock, and Snodgrass transferred his half-interest in Malmeba to Swinnea. ERI agreed to employ Swinnea for six years, and Swinnea agreed not to compete with ERI. At the same time, ERI agreed to continue leasing from Malmeba for six

years.[1]

Unknown to Snodgrass, the wives of Swinnea and Chris Power, an ERI employee, had created a new company called Air Quality Associates a month before Swinnea and Snodgrass executed the buyout agreement. Air Quality Associates was created to perform mold abatement, but later engaged in asbestos abatement as a contractor even though neither wife had experience in the asbestos abatement field. Swinnea did not disclose the existence of Air Quality Associates to Snodgrass during the ERI buyout negotiations. In fact, because Swinnea believed Snodgrass would "run [ERI] into the ground," Swinnea told Power to "[b]e patient because we can buy this company back 50 cents on the dollar." The trial court found that "Swinnea's placement of his wife, Dawn Swinnea, and Tracy Power as principals of Air Quality Associates, Inc. was deceptive, a sham and constituted fraud."

After the buyout, Swinnea's revenue production as an ERI employee dropped 30%–50%. Snodgrass testified that although Swinnea's supervisory responsibilities were to cease under their agreement, Swinnea's revenue production was to remain the same, if not increase. Soon thereafter, Snodgrass learned about Swinnea's relationship with Air Quality Associates from one of ERI's asbestos contractors, Merico, with which Air Quality Associates was competing. Because of the personal relationship between the individuals involved with ERI and Air Quality Associates, Merico told Snodgrass that Merico would no longer work with ERI if ERI were to accept bids from Air Quality Associates on asbestos abatement projects. ERI had been accepting bids from Air Quality Associates without Snodgrass knowing of Swinnea's or Power's relationship with Air Quality Associates.

Power and his wife later bought out the Swinneas' interest in Air Quality Associates. ERI subsequently worked with Air Quality Associates, while its work with Merico declined. Meanwhile, Swinnea and his wife formed a new company, Brady Environmental. The Swinneas told Snodgrass that Brady Environmental was going to clean homes and air ducts. However, Brady Environmental began performing asbestos abatement using the Resilient Floor Covering Institute method. Evidence suggests that ERI's clients' use of this method impacted ERI's business because RFCI does not require a consultant like ERI. Although he was employed by ERI, Swinnea encouraged ERI's clients to use RFCI instead, contrary to ERI's interest and policy. After the relationship between Swinnea and ERI deteriorated, Snodgrass ultimately fired Swinnea, releasing him from his non-compete obligations. Swinnea obtained a license to perform asbestos consulting work the next day and began working for Brady Environmental as a consultant. Snodgrass moved ERI out of Malmeba's building and pursued this lawsuit with ERI against Swinnea, Malmeba, and Brady Environmental.

After a bench trial, the trial court found for Snodgrass and ERI on their claims for statutory fraud in a real estate and stock transaction, common law fraud, breach of the non-compete clause in the contract, as well as for breach of fiduciary duty. It rendered judgment awarding ERI and Snodgrass combined damages of $1,020,700, and $1 million in exemplary

---

1. The parties dispute whether the lease agreement was intended to be consideration for the buyout. None of the documents in the buyout agreement expressly addressed this, but Snodgrass testified that he and Swinnea had agreed to the lease as part of the comprehensive buyout.

damages. The non-exemplary damages awarded by the trial court consisted of both equitable forfeiture and actual damages: forfeiture of $437,500, a portion of the $497,500 paid to Swinnea by ERI; forfeiture of $150,000, the value of Snodgrass's one-half interest in Malmeba transferred to Swinnea; forfeiture of $133,200, constituting the sum of the lease payments from ERI to Malmeba after the buyout; and $300,000 as ERI's lost profits from its business relationship with Merico. The trial court found that a civil conspiracy existed between Swinnea and Brady Environmental, and held Brady Environmental jointly and severally liable with Swinnea for the damages.

The court of appeals reversed and rendered judgment in favor of Swinnea because it found the evidence "legally insufficient to support the damage awards." 236 S.W.3d 825, 832 (Tex.App.-Tyler 2007). In particular, the court of appeals found that ERI failed to prove any actual damages. *Id.* at 841. It found that the equitable remedy of forfeiture was unavailable because there was no fee paid to Swinnea to be forfeited. *Id.* It concluded further that ERI failed to prove that Swinnea obtained any ill-gotten gains subject to disgorgement. *Id.* It determined that the lease payments were not recoverable because the evidence that the lease payments were intended as consideration for the buyout was "incompetent parol evidence." *Id.* at 835. Finally, the court of appeals concluded that there was no basis for joint liability as to Brady Environmental because there was no evidence of a conspiracy between Swinnea and Brady Environmental. *Id.* at 841–42.

Swinnea does not dispute his liability for fraud, breach of contract, or breach of fiduciary duty. Rather, he disputes the damages the trial court awarded. He asserts that the forfeiture award is unsupported by law. He also asserts that the lost profits award is unsupported by legally sufficient evidence. Brady Environmental primarily disputes whether it can be jointly liable for any of the particular damages awarded by the trial court regardless of whether it later conspired in certain wrongful acts.

## II. Equitable Forfeiture

■ The primary question we must address is whether forfeiture of contractual consideration is available as a remedy against Swinnea. We have previously upheld equitable remedies for breach of fiduciary duty. *E.g., Burrow v. Arce,* 997 S.W.2d 229, 237–45 (Tex.1999) (upholding remedy of forfeiture upon attorney's breach of fiduciary duty). In *Kinzbach Tool Co. v. Corbett–Wallace Corp.,* we stated the principle behind such remedies:

> It is beside the point for [Defendant] to say that [Plaintiff] suffered no damages because it received full value for what it has paid and agreed to pay.... It would be a dangerous precedent for us to say that unless some affirmative loss can be shown, the person who has violated his fiduciary relationship with another may hold on to any secret gain or benefit he may have thereby acquired. It is the law that in such instances if the fiduciary "takes any gift, gratuity, or benefit in violation of his duty, or acquires any interest adverse to his principal, without a full disclosure, it is a betrayal of his trust and a breach of confidence, and he must account to his principal for all he has received."

138 Tex. 565, 160 S.W.2d 509, 514 (1942) (quoting *United States v. Carter,* 217 U.S. 286, 306, 30 S.Ct. 515, 54 L.Ed. 769 (1910)). We later reiterated that a fiduciary may be punished for breaching his duty: "The main purpose of forfeiture is not to compensate an injured principal.... Rather,

the central purpose ... is to protect relationships of trust by discouraging agents' disloyalty." *Burrow*, 997 S.W.2d at 238.

 Accordingly, courts may fashion equitable remedies such as profit disgorgement and fee forfeiture to remedy a breach of fiduciary duty. For instance, courts may disgorge all ill-gotten profits from a fiduciary when a fiduciary agent usurps an opportunity properly belonging to a principal, or competes with a principal. *See, e.g., Johnson v. Brewer & Pritchard, P.C.*, 73 S.W.3d 193, 200 (Tex.2002) (stating the rule that courts may disgorge any profit where "an agent diverted an opportunity from the principal or engaged in competition with the principal, [and] the agent or an entity controlled by the agent profited or benefitted in some way"). Similarly, even if a fiduciary does not obtain a benefit from a third party by violating his duty, a fiduciary may be required to forfeit the right to compensation for the fiduciary's work. *See, e.g., Burrow*, 997 S.W.2d at 237 ("[A] person who renders service to another in a relationship of trust may be denied compensation for his service if he breaches that trust."). The difficulty comes in categorizing the damages awarded in this case. Here, the damages awarded by the trial court were not ill-gotten profits from an outside opportunity or external competition, or compensation for work done by the fiduciary. Rather, the trial court returned a significant part of the contractual consideration paid by ERI and Snodgrass to Swinnea as part of the buyout agreement. The situation arises because here the contracting party, Swinnea, was a fiduciary, such that we must consider whether under the circumstances an equitable remedy may cross the line from actual damages for breach of contract or fraud (redressing specific harm) to further, equitable return of contractual consideration.

The trial court found Swinnea liable for fraudulent inducement as to the buyout agreement, and Swinnea does not challenge this liability. The trial court also found that Swinnea owed fiduciary duties both to ERI and to Snodgrass. It follows that Swinnea's actions in fraudulently inducing the buyout agreement contracts were willful breaches of his fiduciary duty. We hold that where willful actions constituting breach of fiduciary duty also amount to fraudulent inducement, the contractual consideration received by the fiduciary is recoverable in equity regardless of whether actual damages are proven, subject to certain limiting principles set out below.

The situation in this case is akin in many respects to the fee forfeiture scenario between a principal and agent, which we discussed at length in *Burrow*, 997 S.W.2d at 237–45. In that case, former clients sued their attorneys alleging breach of fiduciary duty arising from settlement negotiations in a previous lawsuit. *Id.* at 232–33. We held that "a client need not prove actual damages in order to obtain forfeiture of an attorney's fee for the attorney's breach of fiduciary duty to the client." *Id.* at 240. We repeated that "the central purpose of the remedy is to protect relationships of trust from an agent's disloyalty or other misconduct." *Id.* That policy applies equally to the relationship of trust at issue here and the duties Swinnea owed to ERI and Snodgrass. We cited section 469 of the *Restatement (Second) of Agency*, which states that if "conduct [that is a breach of his duty of loyalty] constitutes a wilful and deliberate breach of his contract of service, he is not entitled to compensation even for properly performed services for which no compensation is apportioned." *Id.* at 237. We also stated:

> [T]he possibility of forfeiture of compensation discourages an agent from taking

personal advantage of his position of trust in every situation no matter the circumstances, whether the principal may be injured or not. The remedy of forfeiture removes any incentive for an agent to stray from his duty of loyalty based on the possibility that the principal will be unharmed or may have difficulty proving the existence or amount of damages.

*Id.* at 238. The same principles apply to circumstances where a fiduciary takes advantage of his position of trust to induce a principal to enter into a contract. The remedy of forfeiture is necessary to prevent such abuses of trust, regardless of proof of actual damages.

■ Although forfeiture of contractual consideration may "have a punitive effect" like forfeiture of compensation, *id.* at 240, it may nevertheless be necessary to protect fiduciary relationships. As we said in the attorney-client context:

An attorney who has clearly and seriously breached his fiduciary duty to his client should not be insulated from fee forfeiture by his client's ignorance of the matter. Nor should an attorney who has deliberately engaged in professional misconduct be allowed to put his client to the choice of terminating the relationship and risking that the outcome of the litigation may be adversely affected, or continuing the relationship despite the misconduct.

*Id.* at 244. The same reasoning applies here: a fiduciary who breaches his duty should not be insulated from forfeiture if the party whom he fraudulently induced into contract is ignorant about the fraud, or fails to suffer harm. Likewise, the innocent party should not be put into a difficult choice regarding termination of the contract upon discovering the breach of duty.

■ Where equitable remedies exist, however, "the remedy of forfeiture must fit the circumstances presented." *Id.* at 241. In *Burrow*, we listed several factors for consideration when fashioning a particular equitable forfeiture remedy in the context of attorney-client relationships:

"[T]he gravity and timing of the violation, its wilfulness, its effect on the value of the lawyer's work for the client, any other threatened or actual harm to the client, and the adequacy of other remedies." These factors are to be considered in determining whether a violation is clear and serious, whether forfeiture of any fee should be required, and if so, what amount. The list is not exclusive. The several factors embrace broad considerations which must be weighed together and not mechanically applied. For example, the "wilfulness" factor requires consideration of the attorney's culpability generally; it does not simply limit forfeiture to situations in which the attorney's breach of duty was intentional. The adequacy-of-other-remedies factor does not preclude forfeiture when a client can be fully compensated by damages. Even though the main purpose of the remedy is not to compensate the client, if other remedies do not afford the client full compensation for his damages, forfeiture may be considered for that purpose.

*Id.* at 243–44 (quoting Restatement (Third) of the Law Governing Lawyers § 49 (Proposed Final Draft No. 1, 1996)). We also cited comment c to section 243 of the *Restatement (Second) of Trusts:*

It is within the discretion of the court whether the trustee who has committed a breach of trust shall receive full compensation or whether his compensation shall be reduced or denied. In the exercise of the court's discretion the following factors are considered: (1) whether

the trustee acted in good faith or not; (2) whether the breach of trust was intentional or negligent or without fault; (3) whether the breach of trust related to the management of the whole trust or related only to a part of the trust property; (4) whether or not the breach of trust occasioned any loss and whether if there has been a loss it has been made good by the trustee; (5) whether the trustee's services were of value to the trust.

*Id.* at 243. Several of these factors are also relevant in this context. The gravity and timing of the breach of duty, the level of intent or fault, whether the principal received any benefit from the fiduciary despite the breach, the centrality of the breach to the scope of the fiduciary relationship, and any threatened or actual harm to the principal are relevant. Likewise, the adequacy of other remedies—including any punitive damages award—is also relevant. Above all, the remedy must fit the circumstances and work to serve the ultimate goal of protecting relationships of trust.

There is no indication the trial court followed these principles in fashioning its award. Accordingly, we direct the court of appeals to remand the case to the trial court for consideration of these factors upon resolution of the issues remaining for the court of appeals.[2]

## III. Evidence of Contractual Consideration

■ We next consider whether the trial court properly admitted undisputed testimony offered to show that the lease agreement was intended to be consideration for the buyout agreement, and thus subject to potential forfeiture under our analysis

above. The court of appeals concluded that such testimony was "incompetent parol evidence." 236 S.W.3d at 835. We disagree.

■ The general rule for an unambiguous contract is that evidence of prior or contemporaneous agreements is inadmissible as parol evidence. *David J. Sacks, P.C. v. Haden*, 266 S.W.3d 447, 450 (Tex.2008) (per curiam). However, an exception exists for consistent collateral agreements. As we stated over half a century ago in *Hubacek v. Ennis State Bank*, the parol evidence rule "does not preclude enforcement of prior or contemporaneous agreements which are collateral to an integrated agreement and which are not inconsistent with and do not vary or contradict the express or implied terms or obligations thereof." 159 Tex. 166, 317 S.W.2d 30, 32 (1958); *accord Haden*, 266 S.W.3d at 451 ("Under the exception, parol evidence can be used to demonstrate a prior or contemporaneous agreement that is both collateral to and consistent with a binding agreement, and that does not vary or contradict the agreement's express or implied terms or obligations."). A collateral agreement between parties concerning the relationship of several distinct obligations between them falls within the exception. *See, e.g., Hubacek*, 317 S.W.2d at 34 ("A and B in an integrated contract respectively promise to sell and to buy Blackacre for $3,000.00. A contemporaneous oral agreement between them that the price shall be paid partly by discharge of a judgment which B has against A is operative." (quoting with approval RESTATEMENT (FIRST) OF CONTRACTS section 240 cmt. d (1939))). Here, if the parties agreed that the lease obligation was to be additional

---

**2.** As we discuss below, certain issues that remain as a result of our holdings in this case are properly before the court of appeals on remand, precluding us from remanding the case directly to the trial court.

consideration for the buyout, then such an agreement was a consistent collateral agreement. Nothing in such an agreement would contradict the written contracts. *See id.* at 32 ("If . . . the parol evidence rule precludes enforcement of the oral agreement, it is because the agreement varies or contradicts the terms or obligations of the [written contracts]."). Accordingly, Swinnea's testimony conceding this fact was properly admitted under this long-standing exception to the parol evidence rule. The fact that the lease agreement was consideration for the buyout agreement as a whole is thus established by legally sufficient evidence.

Therefore, as contractual consideration, the lease payments from ERI to Malmeba are subject to forfeiture for Swinnea's breach of fiduciary duty. The trial court should consider whether to include them in fashioning an appropriate equitable forfeiture.

### IV. Lost Profit Damages

■ We turn next to the question of actual damages. Here, where the only actual damages that the trial court awarded were lost profit damages, the issue is whether ERI provided legally sufficient evidence of those lost profits.[3]

■ The rule concerning adequate evidence of lost profit damages is well established:

> Recovery for lost profits does not require that the loss be susceptible of exact calculation. However, the injured party must do more than show that they suffered some lost profits. The amount

of the loss must be shown by competent evidence with reasonable certainty. What constitutes reasonably certain evidence of lost profits is a fact intensive determination. As a minimum, opinions or estimates of lost profits must be based on objective facts, figures, or data from which the amount of lost profits can be ascertained. Although supporting documentation may affect the weight of the evidence, it is not necessary to produce in court the documents supporting the opinions or estimates.

*Holt Atherton Indus., Inc. v. Heine,* 835 S.W.2d 80, 84 (Tex.1992) (citations omitted).

The trial court awarded $300,000 in lost profits "constituting the loss of income from [ERI's and Snodgrass's] business relationship with Merico." Our legal sufficiency analysis thus reviews whether competent evidence establishes this amount with reasonable certainty. *See id.*

■ Snodgrass testified that based on information from his in-house accountant, ERI's net profit margin on revenue from Merico was approximately 25%–30%.[4] As a long-time co-owner and then sole owner of ERI—a small, profitable company—Snodgrass was competent to testify as to ERI's estimated profit margin on the Merico account. *Cf. Bowen v. Robinson,* 227 S.W.3d 86, 97 (Tex.App.-Houston [1st Dist.] 2006, pet. denied) ("Competent evidence of lost profits relating to property can be proved by the testimony of an expert or the owner of the property."). Swinnea directs us to no evidence contra-

---

**3.** We need not distinguish here between ERI's causes of action—common-law and statutory fraud, breach of contract, and breach of fiduciary duty—because ERI's lost profit damages are recoverable for any one of those claims. *See Waite Hill Servs., Inc. v. World Class Metal Works, Inc.,* 959 S.W.2d 182, 184–85 (Tex.

1998) (per curiam) (observing that lost profits are recoverable both as tort and contract damages, subject to the rule precluding double recovery for a single injury).

**4.** Swinnea did not raise a hearsay objection at trial.

dicting this testimony concerning ERI's profit margin.[5] ERI also introduced evidence—including dozens of detailed invoices—indicating that from January 2000 through August 2001 (20 months), ERI averaged $19,833.10 in revenue per month from Merico. Later, from September 2001 through May 2004 (33 months), average revenue dropped to $1,792.59 per month.[6] Contrasting revenue from a time period immediately before the period at issue is an established method of proving revenue for a lost profit damages calculation. *See Tex. Instruments, Inc. v. Teletron Energy Mgmt., Inc.*, 877 S.W.2d 276, 279 (Tex. 1994) ("It is permissible to show the amount of business done by the plaintiff in a corresponding period of time not too remote, and the business during the time for which recovery is sought." (quoting *Sw. Battery Corp. v. Owen*, 131 Tex. 423, 115 S.W.2d 1097, 1098–99 (1938))). Thus, ERI's method for proving its lost profits in a reasonably certain amount—establishing its lost revenue with comparative evidence from a recent time period, and establishing its profit margin on that revenue by competent testimony of its owner—was legally adequate under *Holt Atherton*.

However, ERI's method does not support a calculation yielding the amount of damages awarded by the trial court. Even assuming a 30% profit margin on the work from Merico, Snodgrass's maximum profit margin estimate, the damages award would be only $178,601.05 for the 33–month period at issue when ERI's profits from Merico declined.[7] ERI's evidence thus fails to meet the minimum requirements for legal sufficiency that we set out in *Holt Atherton* regarding reasonable certainty as to the amount awarded by the trial court—here, $300,000. Up to this point, the court of appeals reached the same conclusions that we have. *See* 236 S.W.3d at 838–39 (reciting the same evidence and reaching the same conclusion regarding whether such evidence is legally sufficient to prove $300,000 of lost profit damages with reasonable certainty).

▪ Still, while the evidence does not prove $300,000 in lost profits, ERI's evidence is legally sufficient evidence to prove a lesser, ascertainable amount of lost profits with reasonable certainty. In this situation, such a discrepancy between two reasonably certain amounts will not defeat recovery by ERI. *See Sw. Battery*, 115 S.W.2d at 1099 ("[U]ncertainty as to the fact of legal damages is fatal to recovery, but uncertainty as to the amount will not defeat recovery."); *Tex. Instruments*, 877 S.W.2d at 279 (explaining that *Southwest Battery* and subsequent cases required reasonable certainty as to the amount of lost profit damages); *cf. Akin, Gump, Strauss, Hauer & Feld, L.L.P. v. Nat'l Dev. & Research Corp.*, 299 S.W.3d 106,

---

5. We note that Swinnea's counsel stated on cross-examination of Snodgrass that "if we looked at [ERI's] financials, we could pretty well figure [the profit margin on the Merico account] out." Indeed, Swinnea had the opportunity to attempt to negate Snodgrass's testimony on profit margin with conclusive contrary evidence, if such evidence existed. Yet, Swinnea directs us to no such evidence from which we could determine whether Snodgrass's estimate was mistaken.

6. ERI points us to testimony from another ERI employee that its revenue from Merico was $300,000–$400,000 per year, but the accounting statements introduced by ERI as a trial exhibit conclusively establish otherwise. *See City of Keller v. Wilson*, 168 S.W.3d 802, 820 (Tex.2005) ("[Fact-finders] are not free to believe testimony that is conclusively negated by undisputed facts.")

7. At trial, ERI put on evidence that its estimated lost revenue over the 33–month period was $595,336.83. Thirty percent of this figure is $178,601.05.

109 (Tex.2009) (remanding to the court of appeals where there was some evidence of damages, but not enough to support the full amount awarded by the trial court). ERI proved lost profit damages; its entitlement to recover them survives the trial court's error in awarding too much. Accordingly, the appropriate remedy is to remand the case to the court of appeals to consider the possibility for remittitur on lost profit damages. *See* TEX.R.APP. P. 46.3, 46.5 (providing procedures for remittitur by courts of appeals).

■ Swinnea argues that ERI's lost profits calculation is inadequate because it fails to apply certain credits or deduct certain expenses. First, Swinnea asserts that because ERI's lost profits were on the Merico account, which were in turn lost because of Swinnea's involvement with Air Quality Associates, we must offset any amount that ERI gained by doing business with Air Quality Associates. That is, where the two accounts were mutually exclusive, loss from one must be offset by gain from the other. This argument is unpersuasive in part because the exclusivity arose out of Merico's ultimatum to ERI about Air Quality Associates—"us or them"—not because it was otherwise impossible for ERI to pursue both business relationships simultaneously. The evidence shows that Merico came to give ERI its ultimatum because of Swinnea. Merico did not object to ERI's work with Air Quality Associates—a competitor of Merico's in asbestos abatement—until it discovered that Swinnea and Power were involved with Air Quality Associates. Nothing suggests that ERI could not have profited from working both with Air Quali-

ty Associates (apart from Swinnea) and Merico.[8] Accordingly, because nothing indicates that ERI could not work with both companies, any profits from ERI's work with Air Quality Associates need not be offset against the lost profits from Merico caused by Swinnea's position with Air Quality Associates.

■ Even assuming that Swinnea is correct that profits from Air Quality Associates must be credited against the lost profits figure, he can point to no evidence to support his assertion that ERI profited from work with Air Quality Associates as a substitute for Merico. The plaintiff bears the burden of providing evidence supporting a single complete calculation of lost profits, which may often require certain credits and expenses. *See Holt Atherton,* 835 S.W.2d at 85 ("Recovery of lost profits must be predicated on one complete calculation."). However, the defendant properly bears the burden of providing at least some evidence suggesting that an otherwise complete lost profits calculation is in fact missing relevant credits. *Cf. Brown v. Am. Transfer & Storage Co.,* 601 S.W.2d 931, 936 (Tex.1980) ("The right of offset is an affirmative defense. The burden of pleading offset and of proving facts necessary to support it are on the party making the assertion."). Were this not so, every facially adequate calculation of lost profits would be susceptible to an unsubstantiated challenge that something is missing. That subtle distinction is crucial here because Swinnea directs us to nothing in the record proving that ERI profited—in any amount—from working with Air Quality Associates as a substitute for Merico in

---

8. Swinnea elsewhere points out to us that Air Quality Associates was also doing profitable mold treatment work, while Merico focused on asbestos removal. This suggests that ERI might have had separate consulting opportunities with Air Quality Associates that were unavailable from Merico, meaning it could have consistently worked with both without overlap, as ERI also performed mold assessments. Indeed, ERI began to work with both Merico and Air Quality Associates some time after the period in question.

asbestos abatement; and we can find none.[9] Rather, he simply asserts that ERI does not dispute that it developed a mutually successful relationship with Air Quality Associates. The only evidence in the record indicates that ERI continued to show an overall profit despite the decline in revenue from Merico, and that ERI worked with Air Quality Associates. No evidence shows whether any *profits* from working with Air Quality Associates contributed to ERI's overall profits, as a substitute for Merico or otherwise.[10]

■ Swinnea also contests that overhead costs and other unspecified expenses were not included in ERI's evidence or calculation. However, it is not necessarily the case that a company will incur increased expense or overhead, especially where—as evidence here suggests—a corporation was already profitable at the time damages began, and evidence supports an inference that it could have performed profitable services using only its existing resources. *See Tex. Instruments*, 877 S.W.2d at 279 ("[P]re-existing profit, together with other facts and circumstances, may indicate with reasonable certainty the amount of profits lost." (quoting *Sw. Battery*, 115 S.W.2d at 1099)). This is not a manufacturing scenario, where production costs necessarily exist. Rather, ERI was a consulting company, which wrote plans

and specifications, solicited bids for projects, and completed surveys. Evidence suggests that ERI would have been able to perform all of this service work using its existing employees. Power, for instance, testified that he "put in whatever hours it takes to get jobs done." Swinnea himself had begun contributing much less work to ERI, despite having been one of its most productive workers before. Had Swinnea continued to contribute at his prior level, that productivity would only have helped ERI complete additional projects. Furthermore, after Snodgrass fired Swinnea, ERI began to work with Merico again, while still working with Air Quality Associates, without expansion to ERI's staff. Accordingly, Swinnea has not met his burden to provide at least some evidence that ERI's otherwise complete lost profit damages calculation was actually inadequate because of a necessary credit or additional expense.

■ Swinnea also challenges causation as to ERI's lost profit damages. However, evidence showed that at the end of October 2001, upon concluding a series of conversations about Swinnea's involvement with Air Quality Associates, Merico specifically indicated that it would no longer be working with ERI because of Swinnea's involvement.[11] Swinnea himself testified

9. Swinnea asserts in his brief that where "ERI chose the relationship with AQA [instead of Merico, such] conduct of itself is evidence of ERI's belief that the AQA relationship was the more profitable one." At most, this suggests that ERI might have believed that the Air Quality Associates relationship *would be* the more profitable one, which says nothing about whether it was actually profitable. Swinnea also asserts in his brief that "the AQA relationship was demonstrably ... lucrative to ERI, as the corporate financial records proved." But Swinnea does not direct us to any such financial records in the record. Further, having reviewed hundreds of ERI's invoices (the majority of which were

issued to Merico), as well as other financial records introduced as evidence, we could not find a single piece of evidence in the record proving any profit to ERI from Air Quality Associates.

10. Indeed, we are left to wonder further whether any such alleged profits were in turn for asbestos projects that Merico might have worked on rather than for mold projects.

11. We reiterate that Swinnea does not contest liability. The trial court entered specific findings of fact and conclusions of law concerning the impropriety of Swinnea's involvement with Air Quality Associates. Thus, Swinnea's

that his involvement with Air Quality Associates could harm the Merico relationship, and that a severance of ERI's relationship with Merico would negatively affect ERI's revenues. This evidence is legally sufficient to establish a straightforward link between Swinnea's breach of duty and the loss of profits to ERI.

In sum, legally sufficient evidence does not exist to prove the trial court's lost profit damages award under the minimum requirements of *Holt Atherton.* However, this insufficiency does not extend to reasonable certainty as to *any* amount. Rather, competent evidence exists to establish *some* reasonably certain amount of lost profits—just not the particular amount awarded by the trial court. Unlike a situation where no evidence establishes any amount of lost profit damages with reasonable certainty, the situation here requires a potential reduction, not a take—nothing judgment against the plaintiff. Therefore, we reverse the court of appeals' judgment that ERI recover no lost profit damages and remand the case to that court for further proceedings. Should the court of appeals fail to arrive at a disposition concerning remittitur, it may remand for a new trial on lost profit damages, as we might have if the evidence did not seem conducive to remittitur. *See Formosa Plastics Corp. USA v. Presidio Eng'rs & Contractors, Inc.,* 960 S.W.2d 41, 51 (Tex. 1998) ("[B]ecause there is no legally sufficient evidence to support the entire amount of damages, but there is some evidence of the correct measure of damages, we reverse the judgment of the court of appeals and remand the cause for a new trial.").

Two additional collateral issues remain: punitive damages and factual sufficiency. The trial court found clear and convincing evidence establishing that Swinnea willful-ly, maliciously, and intentionally caused injury to ERI and Snodgrass in committing fraud. Accordingly, exemplary damages may be recoverable. *See* TEX. CIV. PRAC. & REM.CODE § 41.003 (providing that exemplary damages are recoverable if clear and convincing evidence shows harm from fraud or malice). Thus, upon resolution of the actual damages (lost profits) question, it is now proper for the courts below to consider any remaining issues concerning the trial court's initial award of $1 million in punitive damages, which Swinnea has continued to contest.

As for factual sufficiency of the lost profits award, however, we observe that there may be a question of whether Swinnea adequately briefed the issue to the court of appeals. The Texas Rules of Appellate Procedure require adequate briefing. *See* TEX.R.APP. P. 38.1(i) ("The [Appellant's] brief must contain a clear and concise argument for the contentions made, with appropriate citations to authorities and to the record."); *accord Redmon v. Griffith,* 202 S.W.3d 225, 241 (Tex.App.-Tyler 2006, pet. denied) ("In their brief, the [cross-appellants] have not presented much in the way of cogent argument, nor have they cited to any authority in support of their sole issue.... We hold that the [cross-appellants] have waived their sole issue by their failure to adequately brief it."); *Murchison v. State,* 93 S.W.3d 239, 254 (Tex.App.-Houston [14th Dist.] 2002, pet. ref'd) (holding that factual sufficiency point concerning criminal trial was waived because "appellants' argument, record citations, and authorities do not address" the point); *Smith v. Tilton,* 3 S.W.3d 77, 84 (Tex.App.-Dallas 1999, no pet.) ("Points of error asserted on appeal but not briefed are waived."). On remand, the court of appeals should consider whether Swinnea

liability extends to any damage caused by his involvement with Air Quality Associates.

adequately raised a factual sufficiency challenge.

## V. Liability for Conspiracy

■ Having found that legally sufficient evidence established lost profit damages in some amount, and that Swinnea may also be liable for punitive damages as well as forfeiture of contractual consideration, we must next address whether Brady Environmental may be jointly liable for these damages as a conspirator.

■ An actionable civil conspiracy requires specific intent to agree to accomplish an unlawful purpose or a lawful purpose by unlawful means. *Juhl v. Airington,* 936 S.W.2d 640, 644 (Tex.1996). One of the elements of conspiracy is a meeting of the minds on the object or course of action. *Massey v. Armco Steel Co.,* 652 S.W.2d 932, 934 (Tex.1983). Another element is actual damages as the proximate result of the conspiracy. *Id.*

In its live pleading at trial, ERI asserted that Brady Environmental conspired in Swinnea's ongoing fraudulent misrepresentations as well as Swinnea's ongoing breach of fiduciary duty, which among other things damaged existing ERI client relationships. The trial court found that Swinnea's wrongful conduct "continued after the buy-out, including but not limited to his formation of Brady Environmental, Inc." It also found that Brady Environmental "participated in and knowingly accepted the benefits of ... Swinnea's wrongful conduct," and that Brady Environmental "had actual awareness of the wrongful conduct."

Even assuming those findings are true, there is no evidence that any of the damages awarded by the trial court occurred as the proximate result of any involvement by Brady Environmental. Moreover, no meeting of the minds between Swinnea and Brady Environmental could have oc-curred involving the actions causing ERI actual harm—lost profits—because Brady Environmental did not yet exist, having been formed approximately six months after Swinnea left Air Quality Associates. Accordingly, Brady Environmental cannot be jointly and severally liable for any lost profit damages discussed above, or any potential punitive damages that follow from them.

■ Furthermore, while Brady Environmental may have participated in the abuse of trust in Swinnea's ongoing breaches of fiduciary duty and Swinnea's ongoing fraudulent misrepresentations, Brady Environmental had no part in inducing the buyout agreement. As discussed above, the forfeiture of contractual consideration is available as an equitable remedy against a fiduciary who fraudulently induces the contract, regardless of actual harm. Contractual consideration is subject to forfeiture because it was fraudulently bargained for by a fiduciary. Certainly the rule allowing such equitable remedies to protect relationships of trust encompasses the ability to fashion such remedies against those who would conspire to abuse such relationships. *See Kinzbach,* 160 S.W.2d at 514 ("It is settled as the law of this State that where a third party knowingly participates in the breach of duty of a fiduciary, such third party becomes a joint tortfeasor with the fiduciary and is liable as such."). Yet, "the remedy of forfeiture must fit the circumstances presented." *Burrow,* 997 S.W.2d at 241. The trial court's award included no equitable remedy tied to conduct in which Brady Environmental participated. Rather, the only equitable award—forfeiture of contractual consideration—arose from a transaction that occurred approximately a year before Brady Environmental existed. Under the circumstances of this particular case, we believe that even if Brady Envi-

ronmental conspired in later breaches of fiduciary duty or fraud, Brady Environmental is not subject to liability for any particular equitable forfeiture amount from the return of contractual consideration given in the specific transaction at issue. Accordingly, we affirm the court of appeals' judgment that ERI take nothing on its conspiracy claim against Brady Environmental.

## VI. Conclusion

We hold that when a fiduciary fraudulently induced a contract, such a breach of fiduciary duty may give rise to equitable forfeiture of contractual consideration. We therefore reverse the portion of the court of appeals' judgment that ERI take nothing in equity. Because trial courts are required to consider certain factors when fashioning a forfeiture remedy, which we have set out, we direct the court of appeals to remand the case to the trial court, in turn, for review of its forfeiture award in light of these principles. Additionally, we conclude that the court of appeals erred in excluding evidence that certain lease payments were contractual consideration subject to forfeiture because testimony proving this fact was properly admitted under the consistent collateral agreement exception to the parol evidence rule.

We also hold that while legally sufficient evidence does not exist to prove the lost profits awarded by the trial court, legally sufficient evidence does exist to prove some reasonably certain amount of lost profits. We therefore also reverse the portion of the court of appeals' judgment that ERI take nothing on its claims for lost profit damages and punitive damages and remand the case to the court of appeals to consider a remittitur, as well as any other remaining issues, before remanding the case to the trial court.

Finally, we affirm the portion of the court of appeals' judgment that ERI and Snodgrass take nothing on their civil conspiracy claims against Brady Environmental because the actual damages awarded by the trial court were not caused by Brady Environmental's wrongful conduct, and the equitable forfeiture awarded by the trial court arose from a transaction too remote from Brady Environmental's involvement to support liability in equity.