**Affirmed in Part and Reversed and Rendered in Part and Memorandum Opinion filed September 17, 2024.**



In The

# Fourteenth Court of Appeals

---

### NO. 14-23-00356-CV

---

### HTS SERVICES INC., Appellant

### V.

### AINUL ABEDIN AND PACKWELL CONTAINER LINE INC., Appellees

---

**On Appeal from the 80th District Court
Harris County, Texas
Trial Court Cause No. 2017-18649**

---

### MEMORANDUM OPINION

Appellant HTS Services, Inc. ("HTS") appeals a judgment following a jury trial in its lawsuit against appellees Ainul Abedin ("Abedin") and Packwell Container Line, Inc. ("Packwell"). In four issues we construe as two, HTS argues the trial court erred when it disregarded the jury's findings (1) as to the confidentiality of HTS's customer list and (2) as to HTS's damages for lost profits and unjust enrichment. We affirm in part and reverse and render in part.

# I. BACKGROUND

HTS brokers worldwide freight-forwarding services of automobiles and has been in business since 1991. From September 5, 2014, through August 5, 2016, Abedin was employed by HTS as a manager, until he was fired for allegedly stealing time from work. After leaving HTS, Abedin went to work for Packwell.

On March 17, 2017, HTS filed suit against Packwell and Abedin, alleging that Abedin misappropriated HTS's customer list and used it to recruit business for the newly formed Packwell. HTS alleged causes of action for misappropriation of trade secrets, breach of contract, conversion, money had and received, and tortious interference with prospective business relations.

HTS's lawsuit was tried before a jury. The jury heard testimony from the president of HTS, Tarek Morsi ("Morsi"), and the president of Packwell, Al Duran ("Duran"). Abedin did not testify.

Morsi testified that HTS had a customer list of over 10,000 customers developed during its years in business, that the list was confidential, and that HTS required all employees to sign a non-compete agreement before getting access to the customer list. According to Morsi, in response to HTS's lawsuit, appellees identified 364 customers of Packwell that had also been customers of HTS. Morsi testified that HTS had to lower its prices to get back the customers that Packwell had stolen. Duran denied that Abedin had misappropriated HTS's customer list, stated that Abedin had employed marketing strategies to recruit the customers Packwell identified to HTS, and that Abedin had informed Duran that Abedin had not signed a noncompete agreement with HTS.

After HTS rested its case, appellees moved for a directed verdict on all of HTS's claims. The trial court granted appellees a directed verdict on all of HTS's

causes of action except misappropriation of a trade secret and breach of contract. After Packwell put on additional evidence, both parties rested and the case was submitted to the jury.

The jury found that HTS's customer list was a trade secret, that both Abedin and Packwell misappropriated it, and that Abedin had not signed a noncompete agreement with HTS. The jury awarded HTS $384,000.00 for lost profits and $51,502.00 for unjust enrichment.

Appellees filed a motion to disregard the jury's findings, arguing that the evidence was legally insufficient to support them. Appellees argued that HTS's trade secret claim failed because the jury found Abedin did not sign a noncompete agreement, HTS failed to offer its customer list into evidence, and HTS failed to take any reasonable measures to protect its customer list. Finally, appellees argued that there was legally insufficient evidence supporting the award for lost profits.

Following a hearing, the trial court granted appellees' motion, finding that the evidence that appellees misappropriated HTS's trade secrets and that HTS suffered lost profits was legally insufficient. On May 5, 2023, the trial court signed a final judgment that HTS take nothing notwithstanding the jury's verdict. This appeal followed.

## II.   STANDARD OF REVIEW

A trial court may disregard a jury's verdict and enter a judgment notwithstanding the verdict ("JNOV") if there is no evidence to support one or more of the jury findings on issues necessary to liability. *Tiller v. McLure*, 121 S.W.3d 709, 713 (Tex. 2003) (per curiam). To determine whether there is no evidence to support the jury verdict and thus uphold the judgment notwithstanding the verdict, we view the evidence in a light that tends to support the finding of the

disputed facts and disregard all evidence and inferences to the contrary. *Id.*

We measure the sufficiency of the evidence against the relevant part of the jury charge. *See Enzo Invs., LP v. White*, 468 S.W.3d 635, 642 (Tex. App.—Houston [14th Dist.] 2015, pet. denied) (citing *Romero v. KPH Consol., Inc.*, 166 S.W.3d 212, 221 (Tex. 2005)). We consider the evidence in the light most favorable to the verdict and indulge every reasonable inference that would support the challenged finding, crediting favorable evidence if a reasonable factfinder could and disregarding contrary evidence unless a reasonable factfinder could not *City of Keller v. Wilson*, 168 S.W.3d 802, 823, 827 (Tex. 2005). If the evidence would enable reasonable and fair-minded people to find the challenged fact, then JNOV is improper. *See id.* at 823, 827. "We will uphold the jury's finding if more than a scintilla of competent evidence supports it." *Tanner v. Nationwide Mut. Fire Ins.*, 289 S.W.3d 828, 830 (Tex. 2009).

The fact finder is the sole judge of witnesses' credibility and the weight to be given their testimony. *Golden Eagle Archery, Inc. v. Jackson*, 116 S.W.3d 757, 761 (Tex. 2003); *see also Zenner v. Lone Star Striping & Paving L.L.C.*, 371 S.W.3d 311, 314 (Tex. App.—Houston [1st Dist.] 2012, pet. denied). We assume that the jury resolved all conflicts in the evidence in accordance with its verdict if a reasonable factfinder could have done so. *City of Keller*, 168 S.W.3d at 820.

## III.    DISCUSSION

In its first issue, HTS argues that the trial court erred when it disregarded the jury's findings as to the confidentiality of HTS's customer list.

## A.    TRADE SECRET MISAPPROPRIATION

### 1.  Applicable Law

To prove an action for trade-secret misappropriation, the plaintiff must

4

establish it owned or had a right to enforce rights in a trade secret. Tex. Civ. Prac. & Rem. Code Ann. § 134A.002(3-a); *Title Source, Inc. v. HouseCanary, Inc.*, 612 S.W.3d 517, 527–28 (Tex. App.—San Antonio 2020, pet. denied). A trade secret is all forms and types of information that (1) the plaintiff has taken reasonable efforts to keep secret and (2) has actual or potential independent economic value to third parties because it is generally unknown and not readily ascertainable through proper means. Tex. Civ. Prac. & Rem. Code Ann. § 134A.002(6); *Morgan v. Clements Fluids S. Tex., Ltd.*, 589 S.W.3d 177, 187 (Tex. App.—Tyler 2018, no pet.).

A company's customer list may be a trade secret. *See* Tex. Civ. Prac. & Rem. Code Ann. § 134A.002(6); *Title Source*, 612 S.W.3d at 527–28; *see Super Starr Int'l v. Fresh Tex Produce, LLC*, 531 S.W.3d 829, 844 (Tex. App.—Corpus Christi–Edinburg 2017, no pet.); *see also T-N-T Motorsports, Inc. v. Hennessey Motorsports, Inc.*, 965 S.W.2d 18, 22–23 (Tex. App.—Houston [1st Dist.] 1998, no pet.) (customer list was trade secret in common-law claim). The plaintiff must show that it made a reasonable effort to keep the information secret under the circumstances. Tex. Civ. Prac. & Rem. Code Ann. § 134A.002(6)(A); *see FMC Techs. v. Murphy*, 679 S.W.3d 788, 810 (Tex. App.—Houston [1st Dist.] 2023, pet. denied). The plaintiff does not necessarily have to make extreme and expensive efforts to protect trade secrets, *see* Tex. Civ. Prac. & Rem. Code Ann. § 134A.002(6)(A), and a confidentiality or nondisclosure agreement is not required in order to prove that the plaintiff made reasonable efforts. *TASF, LLC v. Turn2 Specialty Cos.*, No. 01-21-00089-CV, 2022 WL 709836, at *11 (Tex. App.—Houston [1st Dist.] Mar. 10, 2022, no pet.) (memo op.); *see* Tex. Civ. Prac. & Rem. Code Ann. § 134A.002(3)(B)(ii)(b). Whether the plaintiff made a reasonable effort to keep the information secret is a question of fact. *FMC Techs.*, 679 S.W.3d

at 810; *see also Title Source*, 612 S.W.3d at 529 (concluding that plaintiff's use of exhibits containing trade-secret information during trade-secret-misappropriation trial more than a year after alleged misappropriation did not show that plaintiff did not use reasonable efforts to protect information as a matter of law).

## 2. Analysis

Here, the jury charge informed the jury that HTS owned a trade secret in the customer list if the customer list (1) derived independent economic value (actual or potential) from not being generally known to and not being readily ascertainable by proper means by other persons who can obtain economic value from the disclosure or use; and (2) was the subject of reasonable measures by the owner under the circumstances to maintain its secrecy. The jury answered "Yes" to the question of whether HTS owned a trade secret in its customer list.

Morsi testified that all of HTS's employees are required to sign a noncompete agreement in order to be employed with HTS. Morsi explained that HTS began implementing this requirement after two previous employees stole his list and opened a competing company. In relevant part, the agreement states:

> I will not solicit or have any contact with any person who was a customer of HTS Services at the time of my termination or within 1 year prior thereto and for whom I rendered services or with whom I became acquainted with as a result of my duties with HTS Services.

Morsi further testified that HTS's customer list contains over 10,000 customers; it includes each customer's name, address, phone number, and email address; and no one outside of HTS has access to the list. Morsi testified that it took HTS hundreds or thousands of hours to compile its customer list and that it would take years to review the records filed by HTS with the government to recreate the list. Morsi testified that HTS protects its customer list by allowing only employees to have access to it and keeping it on a computer, but he acknowledged

6

that it has been printed at times.

While the noncompete agreement does not specifically state that the list is confidential, it requires the employee to return all of HTS's documents, data, and lists, among other materials. The agreement further states that the employee acknowledges that all documents and tangible materials are the property of HTS and are entrusted to the employee on a temporary basis.

This is some evidence that HTS took reasonable efforts to keep its customer's list secret. Therefore, we conclude the trial court erred when it granted appellees' motion to disregard the jury's finding as to whether HTS's customer list was a trade secret. *See Tiller*, 121 S.W.3d at 713.

Appellees argue on appeal, as they did in the trial court, that there was legally insufficient evidence that HTS's customer list was a trade secret because the jury found Abedin did not sign a noncompete agreement, HTS failed to offer its customer list into evidence, and HTS failed to take any reasonable measures to protect its customer list. However, a trade secret is privileged information under the Texas Rules of Evidence, and the Texas Uniform Trade Secrets Act requires a court to "preserve the secrecy of an alleged trade secret by reasonable means." *See* Tex. Civ. Prac. & Rem. Code Ann. § 134A.006; Tex. R. Evid. 507(a). Furthermore, a noncompete agreement is not required in order to show that reasonable efforts were made, *see* Tex. Civ. Prac. & Rem. Code Ann. § 134A.002(3)(B)(ii)(b); *TASF, LLC*, 2022 WL 709836, at *11, and appellees have not pointed us to any authority requiring that a trade secret be disclosed to succeed in a misappropriation-of-trade-secrets claim. Finally, we have previously concluded that there is more than a scintilla of evidence that HTS took reasonable efforts to keep its customer' list secret. Thus, we reject appellees' argument.

We sustain HTS's first issue.

**B. LOST PROFITS**

In its second issue, HTS argues that the trial court erred when it disregarded the jury's findings as to HTS's lost profits and unjust enrichment.

### 1. Applicable Law

Lost profits must be proved (1) with reasonable certainty and (2) by competent evidence. *Horizon Health Corp. v. Acadia Healthcare Co.*, 520 S.W.3d 848, 859–60 (Tex. 2017); *ERI Consulting Eng'rs, Inc. v. Swinnea*, 318 S.W.3d 867, 876 (Tex. 2010); *Szczepanik v. First S. Tr. Co.*, 883 S.W.2d 648, 649 (Tex. 1994); *Gen. Growth Props., Inc. v. Prop. Tax Mgmt.*, 614 S.W.3d 386, 394 (Tex. App.—Houston [14th Dist.] 2020, no pet.). The plaintiff does not have to prove lost profits by an exact calculation. *ERI Consulting*, 318 S.W.3d at 876; *Szczepanik*, 883 S.W.2d at 649. "However, the injured party must do more than show that they suffered some lost profits." *Holt Anderson Indus. v. Heine*, 835 S.W.2d 80, 84 (Tex. 1992). The evidence must show that the lost profits are not uncertain or speculative. *Horizon Health*, 520 S.W.3d at 860; *Tex. Instrs.*, 877 S.W.2d at 279; *CenterPoint Energy Hous. Elec., LLC v. Coleman*, 672 S.W.3d 745, 770 (Tex. App.—Houston [14th Dist.] 2023, no pet.). At a minimum, opinions or estimates of lost profits must be based on objective facts, figures, or data from which the amount of lost profits can be ascertained. *Horizon Health*, 520 S.W.3d at 860; *Phillips*, 475 S.W.3d at 279; *CenterPoint Energy*, 672 S.W.3d at 770.

Lost profits must be based on net profits, not gross revenues. *Texaco, Inc. v. Phan*, 137 S.W.3d 763, 771 (Tex. App.—Houston [1st Dist.] 2004, no pet.). "Net profits" is defined as the difference between a business' total receipts and all of the expenses incurred in carrying on the business. *Id.*; *see also Cargotec Corp. v. Logan Indus.*, No. 14-17-00213-CV, 2018 WL 6695806, at *4 (Tex. App.—

Houston [14th Dist.] Dec. 20, 2018, pet. denied) (mem. op.) ("Broadly speaking, lost profits reflect income from lost business activity, less expenses that would have been attributable to that activity." (citing *Hunter Bldgs. & Mfg., L.P. v. MBI Global, L.L.C.*, 436 S.W.3d 9, 18 (Tex. App.—Houston [14th Dist.] 2014, pet. denied))).

A witness may testify about lost profits by testifying from personal knowledge about what the profit would have been. *Naegeli Transp. v. Gulf Electroquip, Inc.*, 853 S.W.2d 737, 740 (Tex. App.—Houston [14th Dist.] 1993, writ denied). Contrasting revenue from a time period immediately before the period at issue is an established method of proving revenue for a lost profit damages calculation, but it requires evidence about the business's profit margin. *ERI Consulting*, 318 S.W.3d at 877; *see also, e.g.*, *White v. Sw. Bell Telephone Co.*, 651 S.W.2d 260, 262–63 (Tex. 1983) ("White testified that twenty-five to thirty percent of his gross receipts is profits."); *Naegeli Transp.*, 853 S.W.2d at 740 ("Mr. Peterson told him he had [a transformer] available for $295,000. Mr. Peterson then explained how he arrived at a lost profit of $260,000. The transformer cost [Mr. Peterson's company] $10,000.").

## 2. Analysis

Here, Morsi's testimony concerning lost profits is as follows:

| [HTS's counsel]: | Okay. What steps did HTS have to take to maintain the business relationship with its customers after [Abedin] and Packwell started soliciting them? |
|---|---|
| [Morsi]: | We have to really reduce our prices, and that -- that's the only thing, really, to make sure that the customer would come back to our company. |
| [HTS's counsel]: | What level of customer service did HTS have to maintain? |

[Morsi]:           We do a very high quality of customer service in our company

. . .

[HTS's counsel]:   Now, am I correct that HTS -- how -- does -- does HTS charge per container?

[Morsi]:           We charge per container. Yes.

[HTS's counsel]:   How much, on average, was HTS able to charge per container before [Abedin] and Packwell started soliciting HTS's customers?

[Morsi]:           We used to charge at least 4,200 to 4,500. It depends on what kind of item we have to stack inside the container. That will include the trucking, the loading, office fee and the ocean freight.

. . .

[HTS's counsel]:   Let me re-ask the question. By how much, on average, did HTS have to reduce its profit on each container to retain its customers after [Abedin] and Packwell started soliciting them?

[Morsi]:           We started reducing the prices between -- again, to 3,200 to 3,500.

[HTS's counsel]:   On average, how many containers does HTS ship per month between January 1st, 2017 and January 1st, 2019?

[Morsi]:           We average about 40 containers a month, which -- about 500 every year.

[HTS's counsel]:   Did -- how -- was HTS's business able to recover after January 1st, 2019?

[Morsi]:           Takes us about two years, almost, to come back. Yes.

. . .

[HTS's counsel]:   What was HTS's average lost profit per month between January 1st, 2017 and January 1st, 2019?

[Morsi]:           The total amount would be around $40,000 every month.

10

Contrary to HTS's argument on appeal, Morsi did not provide any testimony concerning HTS's profit margin on its shipment of containers. Accordingly, we must conclude that the evidence supporting the jury's lost profits award is legally insufficient. *See ERI Consulting*, 318 S.W.3d at 877; *Texaco, Inc.*, 137 S.W.3d at 771; *see, e.g.*, *Glattly v. Air Starter Components, Inc.*, 332 S.W.3d 6220, 635 (Tex. App.—Houston [1st Dist.] 2010, pet. denied) (concluding that evidence of lost profits was legally insufficient because "Ferguson based her lost profits on a margin provided by Heck that was an average of all of Air Starter's business, not the profit associated with the customers or products at issue in this case").

HTS argues on appeal that appellees failed to preserve their legal sufficiency argument because appellees did not move for a directed verdict after they closed their presentation of evidence. To preserve for appeal a legal sufficiency challenge to the evidence, a party must file a motion for directed verdict, a motion for new trial, a motion for JNOV, or a motion to disregard the jury's findings. *See United Parcel Serv., Inc. v. Tasdemiroglu*, 25 S.W.3d 914, 916 (Tex. App.—Houston [14th Dist.] 2000, pet. denied) (citing *Cecil v. Smith*, 804 S.W.2d 509, 510–11 (Tex. 1991)). Here, after the jury returned its verdict, appellees filed a motion to disregard the jury's findings. We conclude that appellees preserved their legal sufficiency challenge to the evidence supporting the jury's findings. *See id.*

Finally, HTS argues that the trial court erred when it disregarded the jury's award of unjust-enrichment damages because appellees' motion did not challenge this finding by the jury. We agree with HTS. Because appellees' motion did not challenge the unjust enrichment award, and because we concluded that there was legally sufficient evidence supporting the jury's finding in favor of HTS as to its trade-secret-misappropriation claim, we conclude that the trial court erred when it rendered judgment against HTS that it take nothing in unjust-enrichment damages.

11

*See* Tex. Civ. Prac. & Rem. Code Ann. § 134A.004(a) ("Damages can include both the actual loss caused by misappropriation and the unjust enrichment caused by misappropriation that is not taken into account in computing actual loss.").

We overrule HTS's second issue in part and sustain it in part.

## IV. CONCLUSION

We reverse the trial court's judgment in part that HTS take nothing and render judgment that HTS take $51,502.00 for unjust enrichment pursuant to the jury's finding of appellees' liability as to HTS's trade-secret-misappropriation claim. We affirm the part of the trial court's judgment ordering that HTS is not entitled to lost-profit damages.

/s/    Margaret "Meg" Poissant
Justice

Panel consists of Justices Hassan, Poissant, and Wilson.

12