**Opinion issued September 26, 2013.**



In The

# Court of Appeals

For The

# First District of Texas

_____

## NO. 01-11-00202-CV

_____

**CHARLES SADEN, Appellant**

**V.**

**BRIAN SMITH, Appellee**

---

**On Appeal from the 270th District Court**
**Harris County, Texas**
**Trial Court Case No. 2009-0059**

---

## DISSENTING OPINION

Because the majority errs in concluding that the trial court, in its judgment, "permitted duplicative recovery of damages and included additional unauthorized findings," I respectfully dissent.

In this case, appellee, Brian Smith, sued appellant, Charles Saden, for breach of contract and breach of fiduciary duty, two separate and distinct causes of action for two separate and distinct injuries and remedies, arising out of Saden's conduct in the operation of POS Card Processing, Inc. ("POS"), a closely held corporation in which Smith and Saden were the sole shareholders. As noted by the majority, both Smith and Saden each owned 50 percent of the company, were both directors, and were to be paid equally.

In his third issue, Saden argues that the trial court's judgment should be "reformed to require election of one remedy for lost profits" because "the jury was asked to find lost profits on multiple theories of liability" and Smith "did not distinguish his damages among any of these theories, *all of which had the same measure of damages*." (Emphasis added.) Although Saden generally asserts that "Smith made no attempt to distinguish damages from among any of [the] theories of recovery," he does not challenge the legal or factual sufficiency of the evidence supporting the jury's specific damages findings. Rather, after quoting in his brief questions four, ten, and eleven of the trial court's charge to the jury, Saden makes his complaint that "the jury was asked to find *the same lost profits measure of damages*" and "Smith was allowed to recover a judgment that awarded *all three of these overlapping recoveries for lost profits*." (Emphasis added.)

2

In his fifth issue, Saden argues that the trial court's judgment must be "reformed to eliminate findings and recoveries for fraud, defalcation and embezzlement" because these issues "were not submitted to the jury" and recovery on them by Smith has been "waived by omission." Again, Saden does not challenge the sufficiency of the evidence supporting the trial court's conclusions that he, in *breaching his fiduciary duties* owed to Smith, committed fraud, defalcation, and embezzlement.

The majority concludes that in this case "recovery of actual damages for both breach of contract and breach of fiduciary duty violates the one-satisfaction rule," and it holds that the trial court erred in rendering judgment that "permitted duplicative recovery" of damages. It further holds that the trial court erred in including "language" in its judgment about Saden's acts of "fraud, defalcation, and embezzlement."

However, in contrast to Saden's assertions and two of the majority's holdings, the record reveals that (1) the trial court carefully instructed the jury on two different measures of damages on two distinct claims for two distinct injuries, (2) Smith presented evidence that supports the jury's two separate and distinct damages findings, (3) as noted by the majority, the trial court's equitable disgorgement of Saden's profit from his breach of fiduciary duty to Smith did not result in a "damages" award duplicative of the jury's awards, and (4) the trial

3

court, in concluding that Saden, in breaching his fiduciary duties to Smith, committed fraud, defalcation, and embezzlement, did so in support of its equitable disgorgement of Saden's profits derived from POS, not in regard to any separate claim upon which it thought Smith might be entitled to recover.

## Breach-of-Contract Damages

In regard to Smith's breach-of-contract claim, the jury, in response to question one in the trial court's charge, expressly found that Smith and Saden "agree[d] to *equally split the revenues*, less reasonable and necessary expenses, derived from the business agreed to be conducted by POS." (Emphasis added.) And the jury further found that Saden failed to comply with the agreement to equally split with Smith the revenues from POS.

In question four, the trial court instructed the jury that "[l]ost profits are a natural, probable, and foreseeable consequence of . . . Saden's *failure to comply with the agreement*." (Emphasis added.) The trial court expressly asked the jury to measure the lost profits that flowed from Saden's breach of contract. It then asked the jury, "What sum of money, if any, if paid now in cash, would fairly and reasonably compensate . . . Smith for his damages, if any, that resulted from . . . Saden's *failure to comply with the agreement*?" (Emphasis added.) And the jury answered, "$941,907."

4

As noted by the majority, this answer is consistent with the testimony of Smith's expert, Bill Shields, an accountant who reviewed the records of POS. Based on his review of the records and the agreement of Smith and Saden to split the revenue of POS equally, Shields opined that Saden had withheld $941,907 from Smith. Accordingly, the jury reasonably concluded that Saden, in violation of his agreement with Smith, withheld and failed to pay Smith $941,907, Smith's half of the revenues derived from POS. From this answer, it necessarily follows that Saden's half of the revenues of POS also totaled $941,907.

**Breach-of-Fiduciary-Duty Damages**

In regard to Smith's claim against Saden for breach of fiduciary duty, the trial court, in question seven of its charge, defined the term "relationship of trust and confidence," and the jury found that "a relationship of trust and confidence exist[ed] between" Smith and Saden. In question eight, the trial court instructed the jury on fiduciary duties, and the jury found that Saden did not "comply with his fiduciary duties to . . . Smith."

In question ten, the trial court instructed the jury that "[l]ost profits are a natural, probable, and foreseeable consequence of . . . Saden's *failure to comply with his fiduciary duties to* . . . Smith." (Emphasis added.) Here, in contrast to question four, the trial court expressly asked the jury to measure the lost profits that resulted from Saden's breach of fiduciary duties, not those that resulted from

5

his breach of contract. It then asked the jury, "What sum of money, if any, if paid now in cash, would fairly and reasonably compensate . . . Smith for his damages, if any, that resulted from . . . Saden's *failure to comply with his fiduciary duties* to . . . Smith?" (Emphasis added.) And the jury answered, "$393,093" in stark contrast to its answer to question four, which was "$941,907."

Again, Saden does not challenge the sufficiency of the evidence supporting the jury's award of $393,093. He simply assumes that the measure of damages in question four is the same as that in question ten. Based on this assumption, Saden further assumes that the lost profits awarded in answer to question ten are duplicative of those awarded in answer to question four. Of course, the important difference in what lost profits the jury was instructed to consider in answering questions four and ten and the substantial difference in the jury's awards in answer to both questions illustrates the fallacy of these assumptions.

Regardless, the majority asserts, first, "there is a significant overlap between [Smith's] litany of Saden's misdeeds and the misconduct documented and accounted for in the Shield's damages model," and, second, "the record reveals no competent evidence from which a fact finder could determine with reasonable certainty the amount of lost profits separately attributable to breach of contract or only to breach of fiduciary duty."

6

However, as noted by Smith, he presented evidence that the lost profits that resulted from Saden's breach of contract were different from those that resulted from Saden's breach of fiduciary duties. Smith asserts that the lost profits that were "a natural, probable, and foreseeable consequence of . . . Saden's *failure to comply with his fiduciary duties*" included revenue lost by POS due to Smith's failure to secure the best price possible for POS accounts that he secretly sold, failure to secure commission rates for POS equal to those he secured for himself, sale of POS accounts and equipment, theft of $200,000 in certificates of deposit, use of POS funds to pay personal living expenses for himself and his family, theft of POS funds after the appointment of a receiver, and enriching himself through a series of self-dealing transactions. Thus, there is ample evidence in the record from which the jury could have reasonably found that Saden, in breaching his fiduciary duties to Smith, caused Smith damages of $393,093 above and beyond his breach-of-contract damages of $941,907.

Nevertheless, the majority conducts a sua sponte analysis of the evidence and makes a different finding. In support its finding, the majority relies in part on *Holt Atherton Indus., Inc. v. Heine*, 835 S.W.2d 80 (Tex. 1992). In *Holt*, the Texas Supreme Court did explain that the amount of lost profits must be "shown by competent evidence with reasonable certainty" and "opinions or estimates of lost profits must be based on objective facts, figures or data from which the amount of

lost profits can be ascertained." 835 S.W.2d at 84. However, the court further explained that "[r]ecovery for lost profits *does not require that the loss be susceptible of exact calculation.*" *Id.* (emphasis added). And *Holt* is readily distinguishable because (1) Holt specifically argued there was "no evidence supporting the trial court's award of damages for lost profits" and (2) the court held that a conclusory statement about lost income "is not the correct measure of damages" and the testimony was "legally insufficient because it [did] not provide any indication" of how the lost profits were determined. *Id.* at 83–84.

Here the majority, as did the court in *Holt*, engages in a "fact intensive determination" in reaching its finding that Smith did not present reasonably certain evidence of lost profits on his breach-of-fiduciary-duty claim. *See id.* However, as noted above, Saden has not made a no-evidence challenge in this appeal. Thus, the majority, based on its sua sponte review of the evidence, is reversing the trial court's judgment on unassigned error. More important, Smith, as noted above, did present legally-sufficient evidence to support the jury's award of $393,093 for his damages resulting from Saden's breach of fiduciary duties. *See City of Keller v. Wilson*, 168 S.W.3d 802, 822 (Tex. 2005) ("If the evidence at trial would enable reasonable and fair-minded people to differ in their conclusions, then [the fact-finder] must be allowed to do so.").

## Equitable Disgorgement

It has long been the law in Texas that courts "may fashion equitable remedies such as profit disgorgement and fee forfeiture to remedy a breach of fiduciary duty." *ERI Consulting Eng'rs, Inc. v. Swinnea*, 318 S.W.3d 867, 873 (Tex. 2010). And the Texas Supreme Court has clearly explained that "a fiduciary may be *punished* for breaching his duty." *Id*. at 872 (emphasis added). Indeed, "[t]he main purpose of forfeiture is not to compensate an injured principal. . . . Rather, the central purpose . . . is to protect relationships of trust by discouraging . . . disloyalty." *Id*. at 872–73 (quoting *Burrow v. Arce*, 997 S.W.2d 229, 238 (Tex. 1999)).

A plaintiff need not even establish actual damages in order to receive the equitable remedy of disgorgement, and "even if a fiduciary does not obtain a benefit from a third party by violating his duty, a fiduciary may be required to forfeit the right to compensation for the fiduciary's work." *Id*. at 873 (citing *Burrow*, 997 S.W.2d at 237 ("[A] person who renders service to another in a relationship of trust may be denied compensation for his service if he breaches that trust.")). However, the equitable remedy of forfeiture must "fit the circumstances" presented. *Burrow*, 997 S.W.2d at 241. Here, though, Saden does not assert that the trial court's equitable disgorgement did not fit the circumstances.

Rather, Saden argues only that (1) the trial court's equitable disgorgement constituted a double recovery or "windfall" to Smith because it was based on lost profits and (2) the trial court's judgment must be "reformed to eliminate findings and recoveries for fraud, defalcation and embezzlement" because these issues "were not submitted to the jury" and recovery on them by Smith has been "waived by omission."

In question eleven, the trial court asked the jury, "What was the amount of . . . *Saden's profit* from the conduct, if any, that you have found to be a breach of . . . Saden's fiduciary duties to . . . Smith?" (Emphasis added.) And the jury answered "$941,907." Because this question concerned the issue of the appropriateness of equitable disgorgement, i.e., whether it would "fit the circumstances," a question of equity solely in the province of the trial court, the trial court, did not, as asserted by Saden, instruct the jury to consider any lost profits as it did in answering question ten. Instead, the trial court specifically asked the jury to determine "Saden's profit" from his wrong doing, which equaled not only what he withheld from Smith, but also, necessarily, the profit to which Saden himself was entitled as compensation under their agreement to split equally the revenues derived from POS.

In question eighteen, which also concerned the issue of the appropriateness of equitable disgorgement and which was predicated on the jury's negative answer

10

to question eight, the trial court defined the terms "malice" and "clear and convincing." It defined malice as "a specific intent" by Saden "to cause substantial injury or harm to" Smith. And eleven jurors expressly found by clear and convincing evidence that "the harm caused by" Saden's breach of fiduciary duty "resulted from malice."

And, as noted above, the trial court, in its judgment, did conclude that "Saden's profit" of $941,907 should be equitably disgorged from him "as a result of his acts of fraud, defalcation and embezzlement while acting and serving in a fiduciary capacity with respect to" Smith. However, these conclusions were apparently made by the trial court to further show that it considered Saden's behavior so egregious that Saden should be "punished" by being disgorged of his profit from his wrongful acts. The trial court's conclusions did not at all, as asserted by Saden, concern issues that should have been "submitted to the jury" which Smith "waived by omission."

The bottom line is that the trial court's equitable disgorgement from Saden of "$941,907," which equals his half of the revenues derived from POS, is firmly supported by (1) the jury's finding that Saden profited in the amount of "$941,907" by breaching his fiduciary duties to Smith, (2) the jury's finding by clear and convincing evidence that "the harm caused by" Saden's breach of fiduciary duty "resulted from malice," and (3) the trial court's conclusion that Saden obtained this

profit from Smith "as a result of his acts of fraud, defalcation and embezzlement while acting and serving in a fiduciary capacity with respect to" Smith. These findings and conclusion serve to show that the trial court's equitable disgorgement of Saden's compensation "fit the circumstances." *See Burrow*, 997 S.W.2d at 241.

## Conclusion

In its judgment, the trial court, in accord with the jury's findings, awarded Smith $941,907 on his breach-of-contract claim and $393,093 on his claim for breach of fiduciary duty. And, concluding that Saden, in breaching his fiduciary duties to Smith, had committed "acts of fraud, defalcation and embezzlement," the trial court further awarded Smith $941,907 "in equitable disgorgement of the profits" obtained by Saden. In doing so, the trial court did not permit a "duplicative recovery of damages" or "include[] additional unauthorized findings." It simply awarded Smith separate and distinct damages for his separate and distinct injuries, and it reasonably concluded that based on Saden's egregious conduct, he should further be disgorged of his half of the revenues derived from POS.

Accordingly, I would overrule Saden's third and fifth issues and affirm the true and correct judgment of the trial court.


Terry Jennings
Justice

Panel consists of Justices Jennings, Bland, and Massengale.

Jennings, J., dissenting.