**Affirm in part; Reverse in part; Render and Remand; Opinion Filed August 18, 2015.**



In The

# Court of Appeals
## Fifth District of Texas at Dallas

### No. 05-14-00675-CV

**ROSCOE F. "TREY" WHITE, III, WHITE VENTURES ENERGY LLC, AND TRI-PROPERTIES, LTD., Appellants**

**V.**

**MICHAEL POTTORFF AND MONICA FABBIO, DERIVATIVELY ON BEHALF OF INVESTORS GROUP, LLC F/K/A WE INVESTORS GROUP, LLC, Appellees**

**On Appeal from the County Court at Law No. 4
Dallas County, Texas
Trial Court Cause No. CC-11-00751-D**

## OPINION

Before Justices Brown, Stoddart, and Whitehill
Opinion by Justice Stoddart

This case presents an appeal from a judgment rendered after a bench trial. Appellees brought a derivative suit against appellant Roscoe F. "Trey" White, III for fraud by non-disclosure, fraud, breach of fiduciary duty, unjust enrichment, and breach of the covenant of good faith and fair dealing. Appellees sued appellant White Ventures Energy LLC for breach of contract. They also sought declaratory relief. The trial court found in appellees' favor on all issues. We affirm the trial court's judgment in part, and reverse the judgment in part. We remand this case to the trial court for further proceedings.

FACTUAL BACKGROUND

The trial court entered extensive findings of fact and conclusions of law. Our recitation of the background of this case is taken from these findings to the extent they are not challenged on appeal.

## A.    Corporate Structure

White Energy Partners, LLC (WEP) was a Delaware limited liability company. WEP consisted of "members" or investors, four of whom are relevant to this lawsuit: (1) appellee Investors Group, LLC, formerly known as WE Investors Group, LLC (WEIG); (2) White Ventures[1]; (3) Ares Corporate Opportunities Fund II, L.P. (Ares); and (4) Columbus Nova Investment IX, Ltd. and Columbus Nova Ethanol Holdings, LLC (collectively, Columbus). As WEP members, WEIG, White Ventures, Ares and Columbus were all parties to the WEP Limited Liability Company Agreement (WEP Agreement). Appellees Michael Pottorff and Monica Fabbio were members of WEIG. Trey White sat on the board of managers of WEP and acted as the manager of WEIG and White Ventures.

The members' investments in WEP were represented by various classes of "Units." Ares, Columbus, and WEIG owned Class A Units in WEP; White Ventures owned Class B Units. Other WEP members held Class C Units. The parties dispute which rights were granted to which Unit holders by the WEP Agreement. The trial court concluded that the WEP Agreement gave Class A Members and Class B Members rights of first refusal (under Section 10.4.1 of the agreement) and tag-along rights (under Section 10.4.2 of the agreement). On appeal, appellants challenge the trial court's conclusion that Class A Members had tag-along privileges arising from WEP's repurchase of White Ventures's Class B Units.

---

[1] Appellant Tri-Properties, Ltd. owned the majority of White Ventures. Trey White owned and controlled Tri-Properties. Upon WEP's formation, Trey White owned approximately 20% of WEP through his ownership of Tri-Properties and Tri-Properties' ownership of White Ventures.

**B.      Scoular Transaction**

During the second and third quarters of 2006, WEP developed an opportunity to acquire the right to build an ethanol plant (the Scoular Transaction). Trey White—on behalf of WEIG and White Ventures—objected to the Scoular Transaction, and, as a WEP board member, White voted "no" to the acquisition. Although White Ventures did not invest in connection with the Scoular Transaction, WEIG did invest.

Before WEIG invested, Trey White, as manager of WEIG, sent WEIG members an email stating that he was "happy to report" and "pleased to announce" that WEP was pursuing the Scoular Transaction and that WEIG had an opportunity to invest. White never informed WEIG members that he voted "no" to the transaction or had concerns about it.

**C.      Repurchase of White Ventures's Units**

On January 16, 2007, White Ventures executed a Membership Interest Purchase Agreement (Purchase Agreement) in which it agreed to transfer its six million Class B Units in WEP back to WEP (the Repurchase). Ares and Columbus provided the capital to WEP so that WEP could consummate the transaction. In exchange, Ares and Columbus were issued additional Class A Units in WEP.

The trial court concluded the WEP Agreement gave WEIG two opportunities to act in connection with the Repurchase: WEIG could exercise its right of first refusal under Section 10.4.1 or could exercise tag-along privileges under Section 10.4.2. According to the trial court's findings, the WEP Agreement required White Ventures to notify WEIG in writing that WEP had offered to purchase White Ventures's Class B Units in WEP and attach a copy of the Purchase Agreement. WEIG then had a right of first refusal to buy some of White Ventures's Units.

On January 20, 2007, White, on behalf of White Ventures, delivered a Seller's Notice of Sale and 10.4.1 Election to WEIG. White decided not to have WEIG purchase any of White

Ventures's Units. White did not inform any individual WEIG members of WEIG's right of first refusal and did not give WEIG's members an opportunity to determine whether WEIG should purchase any Units.

The trial court concluded that Section 10.4.2 of the WEP Agreement required White Ventures to send a second written notice (along with the Purchase Agreement) to WEIG so WEIG could exercise tag-along privileges, and sell a pro-rata portion of its Units. White Ventures never sent WEIG a copy of the Purchase Agreement, and never sent a 10.4.2 notification.

White Ventures closed the transaction and sold its six million Class B Units on February 1, 2007. White Ventures then transferred the money it received to Tri-Properties.

## D. Lawsuit & Appeal

Appellees sued White Ventures for breach of contract, alleging that under the WEP Agreement, White Ventures was obligated to provide WEIG with notice of WEIG's opportunity to tag along in the sale, and White Ventures failed to do so. Appellees also sued Trey White for fraud by non-disclosure, fraud, and breach of fiduciary duty for his actions and inactions as part of the Repurchase. In both instances, appellees' Repurchase-related claims depend on whether the WEP Agreement gave WEIG, as a Class A Member, a contractual right to "tag along" (on a pro-rata basis) with White Ventures's sale of its Class B Units. We conclude WEIG had no such right and the trial court erred by concluding otherwise.

## A. Tag-Along Provision in the WEP Agreement

In their first issue, appellants assert the evidence is legally insufficient to support the trial court's finding that the WEP Agreement provided WEIG with tag-along privileges in connection with the Repurchase. Rather, appellants argue, the evidence conclusively establishes the WEP Agreement did not afford tag-along privileges to WEIG as part of the transaction and, therefore, appellees' claims must fail.

### 1. *Standard of Review*

When examining a legal sufficiency challenge, an appellate court reviews the evidence in the light most favorable to the challenged finding and indulges every reasonable inference that would support it. *Est. of Finney*, 424 S.W.3d 608, 623 (Tex. App.—Dallas 2013, no pet.) (citing *City of Keller v. Wilson*, 168 S.W.3d 802, 822 (Tex. 2005)). When, as here, an appellant challenges the legal sufficiency of the evidence on a matter for which he or she did not have the burden of proof, the appellant must demonstrate on appeal that there is no evidence to support the adverse findings. *McCullough v. Scarbrough, Medlin & Assocs., Inc.*, 435 S.W.3d 871, 892 (Tex. App.–Dallas 2014, pet. denied). The ultimate test for legal sufficiency is whether the evidence would enable a reasonable and fair-minded fact finder to reach the verdict under review. *Id.*; *see also Est. of Finney*, 424 S.W.3d at 623 (citing *City of Keller*, 168 S.W.3d at 827).

### 2. *Law of Contract Interpretation*

The trial court concluded Delaware substantive law applies in this case, and the parties do not challenge that conclusion on appeal. We apply Delaware law on interpreting contracts.

The interpretation of a contract is a question of law. *Martin Marietta Materials, Inc. v. Vulcan Materials Co.*, 68 A.3d 1208, 1220 (Del. 2012). When interpreting a contract, the court's

role is to effectuate the parties' intent. *Lorillard Tobacco Co. v. Am. Legacy Found*., 903 A.2d 728, 739 (Del. 2006); *Zimmerman v. Crothall*, 62 A.3d 676, 690 (Del. Ch. 2013). It is important to determine what a reasonable person in the parties' position would have thought the contract language means. *Lorillard Tobacco Co.*, 903 A.2d at 739. When interpreting the contract, we are constrained by a combination of the parties' words and the plain meaning of those words where no special meaning is intended. *Id.* We give clear and unambiguous language its ordinary and usual meaning. *Id.* When interpreting contracts, we construe them as a whole and give effect to every provision if it is reasonably possible. *Norton v. K-Sea Transp. Partners L.P*., 67 A.3d 354, 360 (Del. 2013). A meaning inferred from a particular provision cannot control the agreement if that inference conflicts with the agreement's overall scheme. *Id*. When the contract's language is clear and unequivocal, the parties are bound by its plain meaning because creating an ambiguity where none exists could, in effect, create a new contract with rights, liabilities and duties to which the parties had not assented. *Lorillard Tobacco Co.*, 903 A.2d at 739.

### 3. *WEP Agreement Section 10.4*

Section 10.4 of the WEP Agreement is at the heart of the parties' dispute. When the facts of the Repurchase are inserted into Section 10.4 of the WEP Agreement, the agreement states:

> **10.4 Sale by a Class A Member or Class B Member**. Subject to the remaining provisions of this **ARTICLE 10**, if any Class A Member or Class B Member (the "**Selling Member**") [here, White Ventures] receives a bona fide written offer (the "**Third Party Offer**") [here, WEP Offer] from any Person (a "**Third Party**") [WEP] to purchase all or a portion of the [White Ventures's] Interest (the "**Offered Interest**"), and [White Ventures] desires to accept the [WEP Offer], then [White Ventures] shall comply with this **Section 10.4**.

> 10.4.1 <u>Right of First Refusal</u>.
> (a) First, [White Ventures] shall notify in writing all of the other Class A Members and Class B Member(s) ("Remaining Members") of the identity of [WEP] and shall attach a copy of the [WEP Offer]. The Remaining Members [here, WEIG] shall have the right, but not the obligation, to purchase all, but not less than all, of the Offered Interest at the same purchase price and upon

substantially the same terms and conditions as are contained in the [WEP Offer]. . . .

(b) If the Remaining Members fail to exercise their respective options to purchase all of the [WEP Offer] within the 30- and 15-day periods, as applicable, then, after compliance with Section 10.4.2, [White Ventures] may sell all, but not less than all, of the Offered Interest to [WEP] on the same terms and conditions as are contained in the [WEP Offer], provided that such transaction must be completed within 90 days after the expiration of the later of the 30- day or 15-day period referred to above. If the Remaining Members fail to purchase all of the Offered Interest, then they shall not be entitled to purchase any portion of the Offered Interest. Alternatively, [White Ventures] may retain such Offered Interest. If the Offered Interest is not sold to [WEP] within the 90 day period referred to in this Section 10.4.1(a), then the Offered Interest shall not be sold to [WEP] unless the provisions of this Section 10.4.2 are again satisfied. A [WEP] who purchases [White Ventures's] Offered Interest shall not become a substituted Member unless the terms and conditions of Section 13.1 are satisfied.

10.4.2 <u>Tag Along</u>. Provided that [WEIG has] not exercised [its] rights pursuant to Section 10.4.1, [White Ventures] shall notify in writing all of the Members of the identity of [WEP] and shall attach a copy of the [WEP Offer] (the "**Sale Notice**"). [WEIG] may elect to participate in the proposed transfer [6,000,000 Class B Units at $4.23/unit] by delivering to [White Ventures] a written notice of such election within the 20-day period following delivery of the Sale Notice. If [WEIG] elects to participate in such [sale of Class B Units], [WEIG] will be entitled to sell in such proposed [sale of 6,000,000 Class B Units], at the same price [$4.23/unit] and on the same terms, *a number of Units included in such [sale of Class B Units]* equal to the product of (i) the quotient determined by dividing the number of Units (on a fully diluted basis) then held by [WEIG, zero Class B Units], as the case may be, by the aggregate number of Units (on a fully diluted basis) then held by [WEIG and White Ventures], multiplied by (ii) the number of Units to be sold in such proposed Transfer [6,000,000 Class B Units]. [WEIG] shall pay its pro rata portion of the transaction expenses associated with such [sale of 6,000,000 Class B Units]. In the event that [WEIG] objects to the terms of [sale of 6,000,000 Class B Units], such [WEIG's] rights under this Section 10.4.2 shall automatically terminate with respect to such [the sale of 6,000,000 Class B Units] (but not any subsequent Transfers).

(emphasis added).

### 4.     *Class A Units Were Not the Type Included in the Repurchase*

Appellants argue that Section 10.4.2 provides tag-along privileges only to members holding the same class of Units as the class that is the subject of the Third Party Offer. They

further contend that because WEP only offered to repurchase Class B Units, owners of Class A Units, such as WEIG, did not have a right to tag along with that transaction. We agree.

Considering the terms of Section 10.4.2 in conjunction with the terms of the Repurchase, it is clear the WEP Agreement did not afford tag-along privileges to WEIG for at least two reasons. First, the words emphasized above—"a number of Units included in such [sale of Class B Units]"—limits the type of Units that can tag along to the class of Units included in the Repurchase: here, Class B Units. Second, even assuming that the plain meaning of the agreement could be read to apply to both Class A and Class B Units, based on the pro-rata formula provided in Section 10.4.2, the number of shares that WEIG would be entitled to tag along would be determined by dividing the number of WEIG's Class B Units, which was zero, into the total number of outstanding Class B Units, which was 6,000,000, multiplied by the number of Class B Units included in the Repurchase (6,000,000). The end result of this equation is zero because WEIG did not own any Class B Units.

Considering the plain meaning of the WEP Agreement, only holders of Class B Units (had there been any other than White Ventures) could have tagged along as part of the Repurchase.

### 5. *WEP as a Third Party or Person Under Section 10.4*

The WEP Agreement's plain language precludes the conclusion that the Repurchase gave WEIG tag-along privileges for a third reason: Section 10.4.1(b) limits the field of potential buyers whose purchases could trigger the tag along-rights provision to Persons who could become WEP Members. Because WEP could not become a member of itself, the Repurchase did not give rise to any tag-along privileges. According to the WEP Agreement, when a Class B

Member—here, White Ventures—receives a written offer from any Person[2] to purchase any of White Ventures's Units and White Ventures desires to accept the offer, then White Ventures must comply with Section 10.4. WEP Agreement Section 1.7.110 defines Person to mean "any individual, partnership, corporation, trust, limited liability company or other entity." WEP, as a limited liability company, fit within this broad definition of Person. However, before we conclude WEP was a Person for purposes of Section 10.4, we must consider whether the WEP Agreement in any way limits the broad definition of Person.

The last sentence of Section 10.4.1 places such a restriction on the Person who desires to purchase a Member's units. As quoted above, the last sentence of Section 10.4.1 states: "A [Person] who purchases a Selling Member's Offered Interest shall not become a substituted Member unless the terms and conditions of Section 13.1 are satisfied." Section 13.1,[3] which defines Substituted Member, contemplates that a Person acquiring the interest of a Member "shall be entitled to all of the rights and benefits under this Agreement of the transferor of such Interest."

As applied to the Repurchase, the transferor, White Ventures, was a Class B Member. The rights and benefits of a Class B Member include the "rights to (i) vote on various Company matters . . ., and (ii) to receive distributions (liquidating or otherwise) and allocations of Profits and Losses." Thus, Section 10.4.1, when read in conjunction with Section 13.1, restricts the definition of Person purchasing a Member's units to a Person who shall have the right to vote on

---

[2] The parties dispute whether a "Third Party" as used in Section 10.4 means an outsider to the agreement or any Person who makes a bona fide offer to purchase a Member's interest. We do not need to settle that dispute and instead will refer to the "Third Party" as a "Person," which is consistent with the language in Section 10.4.

[3] Section 13.1 states:

> **Substituted Members**. Any transferee acquiring the Interest of a Member as permitted under **ARTICLE** 10 shall be deemed admitted as a Substituted Member with respect to the Interest transferred concurrently with the effectiveness of the Transfer (provided that such transferee, unless already a Member, shall, as a condition to such admission, execute a counterpart of this Agreement, agreeing thereby to be bound by all of the terms and conditions hereof), and such Substituted Member shall be entitled to all of the rights and benefits under this Agreement of the transferor of such Interest.

various Company matters and receive distributions and allocations of profits and losses. We must determine whether, considering this restriction, WEP remained qualified as a Person for purposes of Section 10.4.2.

The Delaware Limited Liability Company Act provides:

Unless otherwise provided in the limited liability company agreement, a limited liability company may acquire, by purchase, redemption or otherwise, any limited liability company interest or other interest of a member or manager in the limited liability company. Unless otherwise provided in the limited liability company agreement, any such interest so acquired by the limited liability company shall be deemed canceled.

DEL. CODE ANN. tit. 6 § 18-702(e) (2010). The LLC Act defines a "limited liability company interest" as "a member's share of the profits and losses of a limited liability company and a member's right to receive distributions of the limited liability company's assets." *Id.* § 18–101(8) (2010). White Ventures's Units would qualify as a limited liability company interest.

After reviewing the WEP Agreement, we do not find any term overriding the LLC Act's provision that "any such interest so acquired by the limited liability company shall be deemed canceled." *Id.* § 18-702(e). Thus, applying the terms of the LLC Act, we must conclude that once WEP acquired White Ventures's Class B Units, those Units were canceled.

While the WEP Agreement restricts the definition of a Person purchasing a Member's Units to a Person who shall have the right to vote on various Company matters and receive distributions and allocations of profits and losses, once WEP acquired White Ventures's Class B Units, those Units were canceled. Because the Units WEP acquired from White Ventures were canceled, WEP lost the rights belonging to Class B Unit Holders to vote on Company matters and receive distributions and allocations of profits and losses.

We conclude WEP was not a "Person" for purposes of Section 10.4 because WEP could not fulfill the obligations of a person who purchases all or a portion of White Ventures's Units

–10–

pursuant to the WEP Agreement. Further, because WEP was not a "Person" for purposes of Section 10.4, Section 10.4 did not apply to the Repurchase, WEIG did not have a right-of-first refusal, the tag-along provision did not apply to WEIG, WEIG was not entitled to notice from White Ventures pursuant to Section 10.4, and White was not required to notify WEIG members about the tag-along provision.

Because WEP could not be a "Person" under Section 10.4.2 and, therefore, Section 10.4.2 did not apply to the Repurchase, we conclude the evidence is insufficient to show White Ventures breached the WEP Agreement by failing to give WEIG notices pursuant to Section 10.4 and the evidence is insufficient to show White breached his fiduciary duties to WEIG in connection with the Repurchase.

### 6. Conclusion

Applying the plain meaning of the words of the WEP Agreement, we conclude WEIG did not have any right to tag along in the Repurchase. Therefore, White did not breach any fiduciary duties to WEIG with respect to the Repurchase, and White Ventures did not breach the WEP Agreement by not giving WEIG a tag-along notice. We sustain appellants' first issue.

As a result of our resolution of appellants' first issue, we need not consider their second and third issues. *See* TEX. R. APP. P. 47.1.

### B. Damages

Appellants contend if we sustain their first issue, they are entitled to reversal of the awards of actual damages, punitive damages, disgorgement of profits, attorney's fees, and prejudgment and postjudgment interest, as well as the declarations pertaining to the tag-along provision, exculpation, and indemnification. The judgment awards appellees actual damages in the amount of $4,708,736. The trial court's findings and conclusions reveal that this award is

–11–

predicated on two liability findings: (i) White Ventures breached the WEP Agreement, and (ii) White breached his fiduciary duties to WEIG.

As to the first theory, the trial court found that White Ventures breached the WEP Agreement by failing to give WEIG notice pursuant to Section 10.4.2, and that WEIG lost $4,708,736 because it did not participate in the Repurchase. Because we concluded that White Ventures did not breach Section 10.4.2 of the WEP Agreement, the award of actual damages cannot stand on a breach of contract theory.

As to the second theory, the trial court found in Finding 174 that White breached his fiduciary duties to WEIG through seventeen separately identified acts and omissions. Some of those breaches related to the Repurchase, some related to the Scoular Transaction, and others were independent of those two matters. In Finding 175, the court found that "[a]s a proximate result of Trey White's breaches of his fiduciary duties, WEIG suffered $4,708,736 in damages." Finding 175, standing alone, does not indicate whether the non-Repurchase-related fiduciary breaches caused any damages. But reading the findings as a whole, we conclude that the trial court found that all of the fiduciary-breach damages were caused by the alleged Repurchase-related breaches. *Cf. In re Bain*, 144 S.W.3d 236, 239 (Tex. App.—Tyler 2004, orig. proceeding [mand. denied]) ("The same rules of interpretation apply in construing the meaning of a court order or judgment as in ascertaining the meaning of other written instruments."); *Duarte v. Disanti*, 292 S.W.3d 733, 735 (Tex. App.—Dallas 2009, no pet.) (courts read statutes as a whole, giving effect to every part and interpreting the parts to harmonize with each other rather than conflict if reasonably possible). The trial court found WEIG lost $4,708,736 because it did not have the opportunity to tag along in the Repurchase. The $4,708,736 accounts for all of the damages found by the court for White's breaches of fiduciary duty, leaving no damages for the non-Repurchase-related breaches. Findings 117 and 123 are also illuminating:

117. By "tagging along," WEIG would have received $4,708,736 for its Units (instead of the $0 is ultimately made on its investment in WEP) and White Ventures would have received $20,641,264 for its Units (instead of $25,350,000 it received because WEIG did not tag along).

. . . .

123. WEIG could have made $4,708,736 and White Ventures could have made $20,641,264 on a "sweat equity" investment.

These findings further show that all $4,708,736 of actual damages that the trial court found were caused by White's alleged breaches related to the Repurchase. The trial court found no other damages that could have been attributable to White's non-Repurchase-related fiduciary breaches. Thus, our conclusion that WEIG had no right to participate in the Repurchase necessarily leads to an additional conclusion: because the trial court only awarded damages for breach of fiduciary duty caused by not affording tag-along privileges to WEIG, the trial court erred by awarding appellees any actual damages for breach of fiduciary duty.

Because we sustain appellants' first issue on appeal, we reverse the award of actual damages to appellees.

## C. Disgorgement of Profits & Constructive Trust

The trial court ordered appellants to disgorge profits in the amount of $20,424,604.[4] The court's findings of fact state $20,424,604 is the amount Tri-Properties received in connection with the Repurchase and White personally profited from the Repurchase. The trial court imposed a constructive trust and equitable lien in WEIG's favor on Tri-Properties and all of Tri-Properties's property. In their fourth issue, appellants assert the evidence establishes the disgorgement of profits is improper, and in their seventh issue they argue the constructive trust placed on Tri-Properties is improper.

---

[4] The trial court also uses the number $20,424,609. Because the $20,424,609 appears to be a typographical error, we will use the number $20,424,604.

The trial court's order that appellants disgorge $20,424,604 in profits was predicated on its conclusion that the WEP Agreement afforded tag-along privileges to WEIG as part of the Repurchase. Because we conclude that WEIG had no contractual right to participate in the Repurchase and WEIG was not injured by White Ventures and White failing to give WEIG and WEIG members notice of the tag-along provision, we conclude the trial court erred by ordering appellants to disgorge their profits from the transaction and by imposing a constructive trust on Tri-Properties.

We sustain appellants' fourth issue to this extent and sustain appellants' seventh issue.

The trial court also ordered White to disgorge the $375,000 fee he received to manage WEIG. Appellants argue White should not be required to disgorge this sum because there is no evidence he received this fee as a result of any wrongdoing. A fiduciary may be required to forfeit the right to compensation for the fiduciary's work when he has violated his duty. *See ERI Consulting Eng'rs, Inc. v. Swinnea*, 318 S.W.3d 867, 873 (Tex. 2010); *see also In re Longview Energy Co.*, No. 14-0175, 2015 WL 2148353, at *5 (Tex. May 8, 2015).

Appellants do not challenge the trial court's finding that White breached his fiduciary duties with respect to the Scoular Transaction or in other non-Repurchase-related ways as found in Finding 175. Appellants only argue that White did not breach his fiduciary duties by failing to provide notice of Section 10.4 to WEIG and its members. Because the trial court concluded White breached his fiduciary duties with respect to the Scoular Transaction (and otherwise), the trial court did not err by ordering White to forfeit the $375,000 compensation he received for managing WEIG. We overrule appellants' fourth issue to this extent.

As a result of our resolution of appellants' fourth issue, we need not resolve their tenth issue. *See* TEX. R. APP. P. 47.1.

**D.    Exemplary Damages**

In their fifth issue, appellants argue the exemplary damages awarded in the judgment are not recoverable and there is no evidence supporting an award of exemplary damages.

Under Delaware law, courts lack jurisdiction to award punitive or exemplary damages unless the legislature has expressly authorized them in a statute. *Adams v. Calvarese Farms Maintenance Corp., Inc.*, No. 4262-VCP, 2010 WL 3944961, at *21 n.204 (Del. Ch. Sept. 17, 2010) (citing *Seals v. Wash. Int'l, Inc.*, 386 A.2d 1156, 1158–59 (Del. Ch. 1978); Donald J. Wolfe, Jr. & Michael A. Pittenger, *Corporate and Commercial Practice in the Delaware Court of Chancery* § 2.05 (2010)). The Delaware legislature has not authorized punitive damages for breach of fiduciary duty. *Id.* Therefore, we agree with appellants that the trial court erred by awarding exemplary damages in the judgment. We sustain appellants' fifth issue and reverse the award of exemplary damages.

**E.    Exculpation & Indemnification**

In their sixth issue, appellants argue the evidence is legally insufficient to support the trial court's declarations that White is not entitled to exculpation or indemnification. The WEIG Agreement states that its members shall not be liable to WEIG or other members and also includes an indemnification provision stating WEIG will indemnify persons such as White from loss, liability, damages, costs, or expenses resulting from a lawsuit. However, both provisions create exceptions in the event a court concludes the member's acts or omissions are found to constitute fraud, gross negligence, or willful misconduct. The trial court's conclusions of law state that White is not entitled to exculpation, limitation of liability, or indemnification under the WEIG Agreement. The judgment also states White is not entitled to indemnification under the WEIG Agreement.

Appellants' arguments on appeal are limited to challenging the trial court's findings with respect to the Repurchase. Appellants, however, do not challenge the sufficiency of the evidence supporting the trial court's findings that, among other things, "Trey White's conduct was fraudulent because Trey White made misleading disclosures to WEIG and its members about the Scoular Transaction." Because appellants do not challenge the evidence supporting the trial court's finding that White acted fraudulently in connection with the Scoular Transaction, and the exculpation and indemnification provisions of the WEIG Agreement are not available to White if a court determines he acted fraudulently, we conclude appellants have not shown the trial court erred by concluding White is not entitled to exculpation or indemnification.

We overrule appellants' sixth issue.

## F.    Attorney's Fees

The trial court's judgment awarded $1 million in attorney's fees and $52,137 for expenses for prosecution of the case through the final judgment. The trial court's judgment also states that if any appellant unsuccessfully appeals the judgment to the Texas Supreme Court, appellees will recover an additional $35,000 from each appealing defendant. In their eighth issue, appellants argue the lump-sum award of attorney's fees for an appeal to the Texas Supreme Court is improper.

In their brief, appellants failed to inform the Court that the parties stipulated on the record in the trial court that the reasonable and necessary attorney's fees to be awarded to WEIG in the event of an unsuccessful appeal to the Texas Supreme Court is $35,000. Rather than having a fact finder determine the amount of reasonable and necessary attorney's fees, the parties chose to stipulate to the amount. *See Paciwest, Inc. v. Warner Alan Props., LLC*, No. 02–10–00378–CV, 2012 WL 3499603, *12 n.38 (Tex. App.—Fort Worth Aug. 16, 2012, pet. denied) (mem. op. on reh'g). The trial court's judgment is consistent with the parties' stipulation and we will not

disturb the parties' agreement. *See Sanchez-O'Brien Oil & Gas Corp. v. Austin Res. Corp.*, No. 14-96-00240-CV, 1998 WL 322686, at *3 n.3 (Tex. App.—Houston [14th Dist.] June 18, 1998, pet. denied) (citing *M.J.R.'s Fare of Dall., Inc. v. Permit & License Appeal Bd.*, 823 S.W.2d 327, 330 (Tex. App.—Dallas 1991, writ denied)). We overrule appellants' eighth issue.

Although appellants do not raise an issue about the $1 million fee award, appellees argue in their brief that appellants do not challenge the trial court's declarations that appellee Pottorff had a statutory right to file the lawsuit and did not violate the WEIG Operating Agreement by filing the suit and, therefore, the judgment must be affirmed as to the declarations and appellees are entitled to recover attorney's fees "according to the parties' stipulation." Appellants assert that appellees are not entitled to recover attorney's fees for securing the favorable declarations because Pottorff cannot be considered the prevailing party.

The parties further stipulated "that reasonable and necessary attorney's fees to be awarded to WEIG in the event of a judgment in favor of WEIG is awarded in the amount of $1 million, plus $52,137 for expenses. . ." The trial court's judgment awards fees and expenses in these amounts to WEIG "for the prosecution of this case through this Judgment." Even after we dispose of this appeal, appellees will have secured a judgment in WEIG's favor and recovered some damages on WEIG's behalf. Therefore, pursuant to the parties' agreement, WEIG is entitled to attorney's fees and costs in the amounts of $1 million and $52,137, respectively, as the parties stipulated.

## G. Interest

In their ninth issue, appellants assert the trial court erred by awarding judgment interest based on Delaware law because judgment interest is a procedural matter. Texas courts have concluded that judgment interest rates are matters of substantive law. *See Votzmeyer v. Votzmeyer*, 964 S.W.2d 315, 321 (Tex. App.—Corpus Christi 1998, no pet.) (citing *Minn.Min. &*

*Mfg. Co. v. Nishika Ltd.*, 885 S.W.2d 603, 633 (Tex. App.—Beaumont 1994), *rev'd on other grounds*, 953 S.W.2d 733 (Tex. 1997); *Bergstrom A.F.B. Fed. Credit Union v. Mellon Mortg.*, 674 S.W.2d 845, 851 (Tex. App.—Tyler 1984, writ ref'd n.r.e.)). The Fifth Circuit likewise has concluded "it is clear that under Texas law judgment interest rates are a matter of substantive law controlled by the law of the state where the cause of action arose." *In re Johnston*, 34 F. App'x 151, 2002 WL 495651, at *2 (5th Cir. Mar. 18, 2002) (citing *Bott v. Amer. Hydrocarbon Corp.*, 458 F.2d 229, 231 (5th Cir. 1972); *Bergstrom A.F.B. Fed. Credit Union*, 674 S.W.2d at 851).

Because judgment interest is a substantive matter, the trial court did not err by awarding judgment interest based on Delaware law. We overrule appellants' ninth issue. But because we have reversed most of the monetary awards to appellees, we also reverse the award of pre-judgment interest.

CONCLUSION

We affirm the trial court's judgment declaring Pottorff had a statutory right to file the lawsuit and did not violate the WEIG Agreement by filing.

We affirm the trial court's judgment ordering White pay WEIG $375,000 representing the fee he received to manage WEIG.

We affirm the trial court's judgment awarding attorney's fees.

We reverse the trial court's judgment awarding $4,708,736 in actual damages.

We reverse the trial court's judgment ordering disgorgement of profits in the amount of $20,424,604.

We reverse the trial court's judgment awarding $4,708,736 in exemplary damages.

We reverse the trial court's declarations in its judgment, in the paragraphs numbered 1 through 8, predicated on the conclusion that appellees possessed tag-along rights with respect to the Repurchase.

–18–

We reverse the trial court's judgment imposing a constructive trust on Tri-Properties.

We reverse the trial court's judgment awarding pre-judgment interest and remand to the trial court to recalculate the amount of pre-judgment interest owed in light of our opinion and judgment.

140675F.P05

/Craig Stoddart/

CRAIG STODDART
JUSTICE



# Court of Appeals
# Fifth District of Texas at Dallas

## JUDGMENT

ROSCOE F. "TREY" WHITE, III, WHITE VENTURES ENERGY LLC, AND TRI-PROPERTIES, LTD., Appellants

No. 05-14-00675-CV     V.

MICHAEL POTTORFF AND MONICA FABBIO, DERIVATIVELY ON BEHALF OF INVESTORS GROUP, LLC F/K/A WE INVESTORS GROUP, LLC Appellees

On Appeal from the County Court at Law No. 4, Dallas County, Texas
Trial Court Cause No. CC-11-00751-D.
Opinion delivered by Justice Stoddart.
Justices Brown and Whitehill participating.

In accordance with this Court's opinion of this date, the judgment of the trial court is **AFFIRMED IN PART** and **REVERSED IN PART**.

We **AFFIRM** the trial court's judgment ordering Roscoe F. "Trey" White, III pay Investors Group, LLC F/K/A WE Investors Group, LLC (WEIG) $375,000 representing the fee he received to manage WEIG. We **AFFIRM** the trial court's judgment declaring Michael Pottorff had a statutory right to file the lawsuit and did not violate the WEIG Agreement by filing. We **AFFIRM** the trial court's judgment awarding attorney's fees.

We **REVERSE** the trial court's judgment awarding $4,708,736 in actual damages. We **REVERSE** the trial court's judgment ordering disgorgement of profits in the amount of $20,424,604. We **REVERSE** the trial court's judgment awarding $4,708,736 in exemplary damages. We **REVERSE** the trial court's declarations in its judgment, in the paragraphs numbered 1 through 8, predicated on the conclusion that appellees possessed tag-along rights with respect to the Repurchase.

We **RENDER** judgment that appellees recover no actual damages, disgorgement of profits, or exemplary damages.

We **REVERSE** the trial court's judgment imposing a constructive trust on Tri-Properties, Ltd.

We **REVERSE** the trial court's judgment awarding pre-judgment interest and **REMAND** to the trial court to recalculate the amount of pre-judgment interest owed in light of our opinion.

Judgment entered this 18th day of August, 2015.