

# In The
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

_____

No. 06-21-00018-CV

_____

MARCIA HARE SLACK, INDIVIDUALLY AND DERIVATIVELY ON
BEHALF OF H.M.H. DAIRY, INC., Appellant

V.

RALPH PREUSS AND PREUSS & ASSOCIATES, PLLC, Appellee

On Appeal from the 6th District Court
Red River County, Texas
Trial Court No. CV05012

Before Morriss, C.J., Burgess and Carter,* JJ.
Memorandum Opinion by Chief Justice Morriss

_____

*Jack Carter, Justice, Retired, Sitting by Assignment

MEMORANDUM OPINION

Marcia Hare Slack, individually (Marcia) and derivatively on behalf of H.M.H. Dairy, Inc. (Dairy), sued Ralph Preuss (Ralph) and Preuss & Associates, PLLC (collectively the Preuss Defendants), and alleged causes of action against the Preuss Defendants for breach of fiduciary duty, statutory fraud, fraud by non-disclosure, civil conspiracy, and aiding and abetting breach of fiduciary duty.[1]  On appeal, Marcia asks this Court to reverse the trial court's grant of the Preuss Defendants' motion for summary judgment.[2]  We affirm the trial court's judgment, because we find that (1) there is no evidence that the Preuss Defendants owed Marcia a fiduciary duty and (2) there is no evidence of an injury or damages suffered by Marcia.

*Background*

Isom Heglar Hare, Jr. (Isom), and his wife, Martha, had three children:  Mark, Marcia, and Deaneth.  During their marriage, Isom and Martha owned a dairy operation and acquired a considerable amount of real property and personal assets.  Isom passed away in 2001, and his will, seeking to reduce the overall estate-tax cost to his and Martha's estates, divided his interest in the couple's community property between Martha and a residuary trust that benefitted Martha and the three children.  In 2012, Martha discussed the anticipated changes in the estate tax that would take place on January 1, 2013, with her accountant, Ralph, and her attorney, and Martha

---

[1]In her live petition, Marcia also sued her brother, Mark Hare, individually, as trustee of the I.H. Hare Residuary Trust and as executor of Martha Hare's estate (collectively Hare).  Although there are causes of action asserted against Hare that arguably may have been brought by Dairy and Marcia, all the causes of action asserted against the Preuss Defendants in the live petition were brought by Marcia alone.

[2]The Preuss Defendants filed combined motions for traditional and no-evidence summary judgment.  The trial court did not specify the grounds on which it granted summary judgment.

2

decided to transfer most of her property to the children in 2012 because of expected adverse gift and estate tax consequences coming in 2013.

Martha arranged for her children to go to Ralph's office on December 31, 2012, to execute an agreement incident to Isom's estate (the Agreement) and three warranty deeds purporting to convey real property from the residuary trust to Martha. Marcia, whose husband had committed suicide less than a month before, met with Ralph separately and signed the Agreement and warranty deeds. On that same day, Martha executed warranty deeds conveying certain tracts to Mark, a tract to Marcia, and two tracts to Deaneth. The effect of those conveyances (along with additional conveyances from Martha to Mark in early 2013) was to vest Mark with a disproportionate share of the real estate that was previously owned by Isom and Martha.

Martha passed away in February 2015, and Mark was appointed executor of her estate. More than three years later, Marcia filed this lawsuit against Mark, individually and as trustee of the residuary trust, and sought an accounting of the residuary trust. Ten months later, Marcia amended her petition, joined Mark, as executor of Martha's estate, and the Preuss Defendants, and asserted various causes of action against Mark, individually, as trustee of the residuary estate, and as executor of Martha's estate, and causes of action against the Preuss Defendants. In Marcia's live petition, all of the causes of action asserted against the Preuss Defendants are connected to the Preuss Defendants' alleged acts and omissions regarding the creation and execution of the Agreement and warranty deeds executed December 31, 2012. This appeal

3

concerns only the summary judgment granted the Preuss Defendants and the dismissal of all of Marcia's claims against the Preuss Defendants.[3]

*The Summary Judgment Evidence*

As relevant to the issues addressed in this opinion, the summary judgment evidence showed specific facts, as set out below.

When Isom died in 2001, his and Martha's community property included nineteen tracts of real property[4] totaling almost 1,100 acres, their primary residence, and another house. At the time of Isom's death, this real property was appraised at $855,700.00, which made Isom's one-half community property interest worth $427,850.00. Isom and Martha's community property also included bank deposits, shares of stock, and other personal property appraised at $1,812,533.00, of which Isom's community share was worth $906,266.50.

In his last will and testament, Isom appointed Martha as independent executrix of his estate, authorized her to distribute the property in his estate "in cash or in kind or partly in cash and partly in kind," granted her all the powers conferred by the Texas Trust Code, and gave her the power, *inter alia*, "to make distributions in kind, in money, or partly in each, without requiring pro rata distribution of specific assets." Under his will, Isom devised his interest in their personal residence and all the household effects to Martha and divided his residuary estate into two parts. To Martha, Isom devised all property from his residuary estate in excess of that

---

[3]After the trial court granted the Preuss Defendants' motion for summary judgment, it denied Marcia's motion for new trial and granted her motion to sever her claims against the Preuss Defendants.

[4]The Inventory, Appraisement, and List of Claims of Isom's estate (Isom's Inventory) described each tract separately and listed them as tracts A through S. In the trial court and in their briefs, the parties have referred to each tract according to its alphabetical designation in Isom's Inventory, and we do the same in this opinion.

4

amount of property valued at an amount that would allow his estate to fully use the federal unified credit against any federal estate tax (i.e., the amount of property in excess of the amount of property in his estate that was exempt from federal estate tax).[5] The remainder of Isom's residuary estate, i.e., property valued in an amount equal to the estate tax exemption, was devised to Mark, as trustee of the residuary trust for the benefit of both Martha, the primary beneficiary,[6] and of his descendants.[7]

On February 10, 2003, Martha, individually and as independent executrix of Isom's estate, conveyed tracts B[8] and S[9] to Mark, as trustee of the residuary trust, in partial funding of the residuary trust.[10] The remaining funding of the trust consisted of 22,900 shares of H.M.H. Dairies, Inc., and $53,142.00 in cash.[11] Marcia did not challenge Martha's funding of the residuary trust while Martha was living and has not challenged that funding in this lawsuit.

---

[5]The amount of property in an estate that is exempt from federal estate tax because of the unified credit is commonly referred to as the "estate tax exemption." In 2001, the estate tax exemption was $675,000.00. *See* Taxpayer Relief Act of 1997, Pub. L. No. 105-34, § 501, 111 Stat 788 (codified as amended at 26 U.S.C.A. § 2010(c)).

[6]The will provided that, during her lifetime, Martha was to be considered the primary beneficiary and directed the trustee to pay so much, or all, of both the net income and principal of the trust for the reasonable maintenance, support, education, or comfort of the primary beneficiary and Isom's descendants.

[7]The will did not specifically direct that any particular property be placed in the residuary trust. However, the will directed that, upon the death of Martha, the trustee of the residuary trust was to make the following specific distributions from the trust estate: (1) to Mark, tracts J, H, and 15 acres out of tracts C and E; (2) to Marcia, tract D and tracts C and E, less the 15 acres distributed to Mark; and (3) to Deaneth, tract A, which included Isom's and Martha's primary residence. Any remaining property in the trust was to be distributed to Mark, Marcia, and Deaneth in equal shares.

[8]According to Isom's Inventory, tract B was appraised at $34,100.00.

[9]According to Isom's Inventory, tract S was appraised at $79,060.00.

[10]Since only tracts B and S were conveyed to the residuary trust, under the terms of Isom's will, Martha acquired Isom's interest in tract A and tracts C through R.

[11]The value of the real property, stock, and cash distributed to the residuary trust totaled $675,000.00.

5

Although she contended in her live pleading that Isom's will directed that tracts A,[12] C, D, E, H, and J were to be placed in the residuary trust, Marcia did not assert any wrongdoing on Martha's part in failing to fund the residuary trust with those tracts, and she did not assert any cause of action against Mark, as executor of Martha's estate, for any alleged wrongdoing by Martha.

Ralph testified that he had prepared personal tax returns for Isom and Martha, until Isom's death, and then had prepared Martha's tax returns until her death. He also prepared the tax returns for Dairy from 1998 until 2017[13] and the tax returns for Hare & Hare Partnership until its dissolution. Ralph also testified that he has prepared Mark's personal tax returns since 1998 but that he had never prepared Marcia's or Deaneth's tax returns. Before December 31, 2012, he did not have any correspondence or telephone calls for tax purposes with either Marcia or her late husband, Tom Slack. He also prepared tax returns for Isom's and Martha's estates and for the residuary trust. Ralph acknowledged that he owed a fiduciary duty to his clients, which would include Mark, Mark as trustee of the residuary trust, the partners of Hare & Hare Partnership, Isom, and the executor of Isom's estate.

Ralph explained that the residuary trust was funded with $675,000.00 so that, after Martha's death, that sum would not be included in her residuary estate. He assumed that, at the time that Isom's will was created, Isom and Martha had discussed the need for estate planning with their attorney. After Isom passed away, Martha talked to Ralph frequently about her estate plan and what she planned to do with her property. Ralph testified that, in 2012, he would have

---

[12]Tract A included Isom's and Martha's personal residence, which the will specifically devised to Martha.

[13]Mark's wife, Debbie, testified that Preuss & Associates prepared the general ledgers for Dairy.

told Martha that, on January 31, 2013, the estate tax law was about to change and that, if she made the transfers in 2012, there would be no estate or gift tax consequences, but that, if something happened to her in 2013 after the law changed, she would owe estate taxes. He would also have told her the amount her estate would owe. He told this to all his clients that had taxable estates.

Ralph testified that, because she had decided to make some real estate transfers, Martha met with her attorney, Frank Bauer, and explained to him what she wanted and that there were certain ambiguities with Isom's will. Bauer made recommendations about how to accomplish what she wanted, considering some inconsistencies in Isom's will, and Bauer prepared the Agreement that he requested that Martha, Mark, Marcia, and Deaneth all sign, along with deeds to transfer the property.

Ralph had some discussions with Martha regarding her meeting with Bauer concerning the Agreement.[14] At some point, Bauer did not want the Agreement signed in his office because of a possible conflict of interest, and Martha asked Ralph to facilitate the signing of the documents Bauer had prepared. Ralph acknowledged that, on December 20, 2012, he knew that Mark was going to receive a disproportionate share of the land that Isom and Martha had owned and that this was a "touchy" issue. However, he denied ever discussing that with Mark. Rather, he testified that it was his understanding that Martha had explained to each child what they were going to receive as a result of the Agreement.

---

[14]Invoices from Bauer indicated that he first discussed an estate plan for Martha with Ralph on May 15, 2012. The next invoice on November 11, 2012, indicated a conference with Ralph regarding Martha's estate plan, and entries on several dates in November and December indicated Bauer drafted and revised the Agreement and warranty deeds and had additional telephone conferences with Ralph about the same.

Ralph testified that the Agreement and deeds were originally scheduled to be signed earlier in December, but that snow prevented travel, so the signing was rescheduled for December 31. Martha had told him that, because Marcia's husband had committed suicide sometime in December, that event would affect when Marcia would be available to meet. When Marcia came to Ralph's office, she mentioned his death and appeared agitated, but Ralph was not concerned about her state of mind when she signed the documents.

According to Ralph, the meeting was scheduled for all the family to be at his office at two o'clock. Marcia showed up a little after one o'clock and asked to talk with him before the rest of the family got there. She asked about the documents and what property was being transferred, and he did his best to explain that it was a family settlement agreement to correct some ambiguities in Isom's will and that the attorney had asked that all of them sign it. She also wanted to clarify that Mark was getting certain properties and what property she was getting. He showed her the deeds and laid them out on his desk for her to review. Ralph testified that he informed Marcia of the reason the deeds were being signed that day, which was because of the change in the estate tax law, and that the Agreement was being signed because of the ambiguities in Isom's will. Marcia's daughter, Lacy, was with her during this time. Ralph did not watch Marcia read the Agreement or the deeds. He did not recall if Marcia read the documents but noted that she did not seem confused by them. He did not ask her if she had seen the documents before that day. Ralph also testified that the estate tax did change on January 1 but added that Congress passed legislation shortly afterwards to reinstate the exemption amount at something other than $1,000,000.00.

Marcia testified that her mother told her that she needed to sign some papers because of the "Obama death tax" and that, if she did not sign the papers, the government was going to take everything they had. She said that her mother told her that, if she did not come sign the papers that day, her mother would not leave her anything, so she went and signed. Marcia also testified that, when she walked into Ralph's office, she told him that her husband killed himself and that she was on "four bars" of Xanax.

According to Marcia, Ralph told her that the documents were her mother's wishes and that she needed to sign them due to the "Obama death tax." Marcia said that she did not know what she signed or how many documents she signed.[15] She denied that she read the documents, though she admitted that nobody prevented her from doing so, and said that she signed the Agreement without reading it. She also testified that she was on Xanax and did not care what it was for; she just wanted to do something for her mother and her brother. She also testified that she did not know that she received an 84-acre tract that day or that her mother had deeded it to her in trust. At some point, she told her mother that she did not like what happened; her mother told her she would fix it, but never did.

_____

[15]The Agreement recited that its purpose was to resolve certain ambiguities in Isom's will and by transfers or exchanges of real property belonging to the residuary trust and to Martha to effect a partition of the real property belonging to Isom's estate and to Martha, to effect a settlement of Isom's estate and to effect a distribution and partition of the property of the residuary trust. Warranty deeds executed by Mark, as trustee, and *pro forma* by Deaneth and Marcia on December 31, 2012, purported to transfer tracts C through H, J through M, P, and S to Martha. A warranty deed executed by Martha on December 31, 2012, conveyed tracts F through H, J through M, and P to Mark. A warranty deed executed by Martha on December 31, 2012, conveyed tracts C, E, and part of tract D to Mark. A warranty deed executed by Martha on December 31, 2012, conveyed 84 acres out of tract D to Marcia. Later, Martha executed warranty deeds dated February 10, 2013, that conveyed tracts B and S to Mark. However, while the summary judgment evidence showed that the residuary trust was partially funded by tract B, there was no summary judgment evidence that Mark, as trustee of the residuary trust, conveyed tract B from the residuary trust to Martha or to any other person or entity. Summary judgment evidence suggests that tract B remains in the residuary trust.

Marcia complained that Ralph could have asked her if she had seen the documents before and that he could have told her that, if she had not seen them, signing the documents could not happen that day. When asked if Ralph had anything to do with scheduling her visit to his office, Marcia replied that her mother told her that she needed to go to Ralph's office and do this before December 31. She also agreed that she did not talk with Ralph before the meeting. She did not remember Ralph saying anything other than something about the "Obama death tax" and that those were her mother's wishes. When asked if she relied on anything Ralph said to her at the meeting, Marcia replied that she relied on him to be an honorable, good man that would not let her sign anything she should not be signing.

She also testified that, other than on December 31, 2012, she had seen Ralph a couple of times afterward when her mother stopped by to see him, that she stopped by with her father, and that she went to see him several times with her mother after her father died. She acknowledged that Ralph had been her father's and mother's certified public accountant (CPA), and she did not remember asking Ralph for any information. She did not know if she ever employed Ralph as her CPA but thought that her father may have taken her stuff to him around the time she was first married.[16] She thought that Ralph owed her a fiduciary duty because he owed a duty to her father's company, and she was a shareholder. She also thought Ralph had a fiduciary relationship with her because her family had been doing business with him for forty years.

---

[16]In her sworn declaration, Marcia stated that she had been married to her husband for fifteen years at the time of his death. Apparently, when Isom executed his will in 1989, Marcia was married to another man. It is not clear to which marriage Marcia referred.

Marcia acknowledged that she did not have a social or domestic relationship with Ralph and that the only personal relationship with him was that he knew her family.

Mark testified that, out of the 121 acres originally contained in tract D, he received 37 acres and Marcia received 84 acres from Martha on December 31. He saw Marcia that day and did not tell her that he received 37 acres out of tract D. He was told that Martha conveyed Marcia's portion to her daughter, Lacy, as trustee, because Marcia's husband was having problems with the government and Martha was worried it could get seized. Martha also wanted to convey the property before midnight on December 31 because the estate tax exemption was supposed to go from five million dollars to one million dollars.

He also testified that, in late November 2012, Martha had contacted him several times that she was going to have to do some estate planning right away because of the fiscal cliff. They had a meeting with Ralph, and his mother told them that she had some thoughts about what she wanted to do and that she had mentioned it to Marcia and Deaneth. Martha had three manilla envelopes; she told Ralph she wanted one to go to Deaneth, one to Marcia in the trust, and one to Mark. Mark denied that he knew the contents of the envelopes.

Mark also testified that he was told that the meeting on December 31 was a family meeting to sign some deeds because Martha needed to get it out of her name before the end of the day because Obama had not signed anything. He did not know what Martha told Marcia, and he denied that he insisted in a phone call that Marcia sign the papers.

Debbie Hare testified that she attended the November meeting between Martha, Mark, and Ralph at Ralph's office. According to Debbie, the discussion was about tax liability and

11

how to lessen Martha's estate to less than one million dollars. Ralph told Martha that she could deed some property away to lessen her estate. She did not know why Marcia and Deaneth were not invited to that meeting.

Marcia's daughter, Lacy, testified that Marcia said she was going to Ralph's office to sign tax papers. She said that Marcia was taking Xanax and did not look well. Marcia took two Xanax in the car, and she seemed overwhelmed. She also confirmed that Marcia told Ralph about being on Xanax and about the recent death of her husband.

Lacy also testified that, at Ralph's office, there were a lot of papers on the desk spread out and turned to signature pages. Marcia asked what they were, and Ralph said they were papers that Martha had prepared for her that she was supposed to sign that day. Lacy did not look at the papers because she was told they were tax papers that would help Martha with tax issues with her land. She was sure Marcia looked at the papers. Lacy testified that Ralph did not prevent Marcia from reading any of the documents. She did not feel like Marcia was capable of signing legal documents that day.

*Standard of Review*

"The grant of a trial court's summary judgment is subject to de novo review by appellate courts." *Brown v. CitiMortgage, Inc.*, No. 06-14-00105-CV, 2015 WL 2437519, at *2 (Tex. App.—Texarkana May 22, 2015, no pet.) (mem. op.) (citing *Provident Life & Accident Ins. Co. v. Knott*, 128 S.W.3d 211, 215 (Tex. 2003)). "In making the required review, we deem as true all evidence which is favorable to the nonmovant, we indulge every reasonable inference to be drawn from the evidence, and we resolve any doubts in the nonmovant's favor." *Id.* (citing

12

*Valence Operating Co. v. Dorsett*, 164 S.W.3d 656, 661 (Tex. 2005)). "When the trial court does not specify the basis for its ruling, we must affirm a summary judgment if any of the grounds on which judgment is sought are meritorious." *Id.* (citing *Merriman v. XTO Energy, Inc.*, 407 S.W.3d 244, 248 (Tex. 2013)).

"To be entitled to traditional summary judgment, a movant must establish that there is no genuine issue of material fact so that the movant is entitled to judgment as a matter of law." *Id.* (citing TEX. R. CIV. P. 166a(c); *Mann Frankfort Stein & Lipp Advisors, Inc. v. Fielding*, 289 S.W.3d 844, 848 (Tex. 2009)). "Once the movant produces evidence entitling it to summary judgment, the burden shifts to the nonmovant to present evidence raising a genuine issue of material fact." *Id.* (citing *Walker v. Harris*, 924 S.W.2d 375, 377 (Tex. 1996)). "A defendant who conclusively negates a single essential element of a cause of action or conclusively establishes an affirmative defense is entitled to summary judgment on that claim." *Id.* (citing *Frost Nat'l Bank v. Fernandez*, 315 S.W.3d 494, 508–09 (Tex. 2010)).

"When 'there is no evidence of one or more essential elements of a claim or defense on which an adverse party' has the burden of proof, a party may qualify for a no-evidence summary judgment." *Rivas v. Estech Sys, Inc.*, No. 06-20-00058-CV, 2021 WL 2231262, at *1 (Tex. App.—Texarkana June 3, 2021, no pet.) (mem. op.) (quoting TEX. R. CIV. P. 166a(i)). "To defeat a no-evidence motion, the nonmovant must produce more than a scintilla of probative evidence raising a genuine issue of material fact as to each challenged element of its cause of action." *Id.* (quoting *Vonocom, Inc. v. Advocare Int'l, LP*, No. 05-19-00610-CV, 2020 WL 1528496, at *3 (Tex. App.—Dallas Mar. 31, 2020, no pet.) (mem. op.) (citing *Merriman*, 407

13

S.W.3d at 248).  "If the nonmovant fails to do so, the trial court must grant a no-evidence summary judgment motion."  *Id.* (quoting *Vonocom, Inc.*, 2020 WL 1528496, at *3 (citing TEX. R. CIV. P. 166a(i))).  "Less than a scintilla of evidence exists when it is 'so weak as to do no more than create a mere surmise or suspicion' of a fact."  *Id.* (quoting *Vonocom, Inc.*, 2020 WL 1528496, at *3 (quoting *King Ranch, Inc. v. Chapman*, 118 S.W.3d 742, 751 (Tex. 2003) (quoting *Kindred v. Con/Chem., Inc.*, 650 S.W.2d 61, 63 (Tex. 1983)))).

"When a party moves for summary judgment on both traditional and no-evidence we first address the no-evidence grounds."  *Merriman v. XTO Energy, Inc.*, 407 S.W.3d 244, 248 (Tex. 2013).  "That is because if the non-movant fails to produce legally sufficient evidence to meet his burden as to the no-evidence motion, there is no need to analyze whether the movant satisfied its burden under the traditional motion."  *Id.*

*(1)     There Is No Evidence that Ralph Owed Marcia a Fiduciary Duty*

"Generally, the elements of a claim for breach of fiduciary duty are (1) the existence of a fiduciary duty, (2) breach of the duty, (3) causation, and (4) damages."  *First United Pentecostal Church of Beaumont v. Parker*, 514 S.W.3d 214, 220 (Tex. 2017) (citing *ERI Consulting Eng'rs, Inc. v. Swinnea*, 318 S.W.3d 867, 873 (Tex. 2010)).  Marcia asserted a claim against the Preuss Defendants for breach of fiduciary duty.  The Preuss Defendants asserted that there was no evidence that Ralph had a fiduciary relationship with Marcia, that there was no evidence of a fiduciary duty toward Marcia, and that there was no evidence of damages.

"In certain formal relationships, such as an attorney-client or trustee relationship, a fiduciary duty arises as a matter of law."  *Meyer v. Cathey*, 167 S.W.3d 327, 330–31 (Tex. 2005)

14

(citing *Johnson v. Brewer & Pritchard, P.C.*, 73 S.W.3d 193, 199 (Tex. 2002)). However, as Marcia acknowledges in her brief, an accountant-client relationship does not always give rise to a fiduciary duty. *In re Estate of Abernethy*, 390 S.W.3d 431, 438 (Tex. App.—El Paso 2012, no pet.) (citing *Squyres v. Christian*, 253 S.W.2d 470, 471 (Tex. App.—Fort Worth 1952, writ ref'd n.r.e.)). Nevertheless, a fiduciary duty may arise informally out of "a moral, social, domestic or purely personal relationship of trust and confidence." *Meyer*, 167 S.W.3d at 331 (quoting *Associated Indem. Corp. v. CAT Contracting, Inc.*, 964 S.W.2d 276, 287 (Tex. 1998)).

"Whether a confidential relationship exists is 'determined from the actualities of the relationship between the persons involved.'" *Gray v. Sangrey*, 428 S.W.3d 311, 316 (Tex. App.—Texarkana 2014, pet. denied) (quoting *Thigpen v. Locke*, 363 S.W.2d 247, 253 (Tex. 1962)). Since a fiduciary, or confidential, relationship "is an extraordinary one[, it] will not be created lightly." *In re Estate of Kuykendall*, 206 S.W.3d 766, 771 (Tex. App.—Texarkana, 2006, no pet.). "The mere fact that one subjectively trusts another does not, alone, indicate that confidence is placed in another in the sense of a fiduciary duty. Some such relationship before and apart from the transaction at issue between the parties is required." *Id.* (citing *Pinnacle Data Servs., Inc. v. Gillen*, 104 S.W.3d 188, 198 (Tex. App.—Texarkana 2003, no pet.), *disapproved on other grounds by Ritchie v. Rupe*, 443 S.W.3d 856, 870–71 n.17 (Tex. 2014.)). An informal confidential relationship may arise where one party "is accustomed to being guided by the other party's judgment and advice and there exists a long association in a business relationship as well as a personal friendship." *Areda v. S-W Transp., Inc.*, 365 S.W.3d 838, 841 (Tex. App.—Dallas 2012, no pet.) (citing *Esty v. Beal Bank S.S.B.*, 298 S.W.3d 280, 304 (Tex. App.—Dallas 2009,

15

no pet.)). "Although we recognize the existence of a confidential relationship is ordinarily a question of fact, when the issue is one of no evidence, it becomes a question of law." *Id.* at 841–42 (quoting *Crim Truck & Tractor v. Navistar Int'l Transp. Corp.*, 823 S.W.2d 591, 594 (Tex. 1992), *superseded by statute on other grounds as noted by Subaru of Am., Inc. v. David McDavid Nissan, Inc.*, 84 S.W.3d 212, 225–26 (Tex. 2002)).

Marcia points us first to Ralph's testimony acknowledging that he owes his clients a fiduciary duty. However, Ralph denied that Marcia had ever been his client and denied ever preparing her tax returns. Marcia only speculated that her father may have taken her papers to Ralph sometime around the time she was first married, which would have been at least fifteen years before the December 31 meeting. However, mere speculation is not evidence. *See Alamo Heights Indep. Sch. Dist. v. Clark*, 544 S.W.3d 755, 773 (Tex. 2018). Consequently, we find that there was no evidence that Marcia was Ralph's client.

Marcia also asserts that there was an informal fiduciary, or confidential, relationship. In support of this assertion, Marcia points initially to testimony that Ralph helped Mark prepare inventories for the residuary trust and Martha's estate, helped Mark value the Dairy livestock and value the Hare & Hare Partnership owned by Martha's estate, and prepared a letter summarizing the assets in the residuary trust. However, Mark, as trustee of the residuary trust, was the one authorized to hire an accountant in the administration of the trust. *See* TEX. PROP. CODE ANN. § 113.018 (Supp.). Consequently, Mark, as the trustee who retained Ralph to help him in administering the trust, was the client, not Marcia as a beneficiary of the trust. *See Huie v. DeShazo*, 922 S.W.2d 920, 925 (Tex. 1996). Likewise, as executor of Martha's estate, Mark was

16

entitled to all necessary and reasonable expenses incurred by him in preserving, safekeeping, and managing the estate. *See* TEX. ESTATES CODE ANN. § 352.051(1)(A). For that reason, he was authorized to employ an accountant in the administration of the estate. *See Ulrich v. Estate of Anderson*, 740 S.W.2d 481, 483–84 (Tex. App.—Houston [1st Dist.] 1987, no pet.). Consequently, Mark, as the executor who retained Ralph to help him in administering the trust, was the client, not Marcia. Marcia presented no evidence that she was involved in any way with the administration of either the residuary trust or Martha's estate or that she had any interaction with Ralph regarding his assistance to Mark in the administration of either. Therefore, we find that Ralph's assistance of Mark in the administration of the residuary trust and Martha's estate is no evidence and does not support Marcia's contention that Ralph had an informal fiduciary relationship with Marcia.[17]

Finally, Marcia points us to the testimony that Ralph prepared tax returns and performed other accounting work for the Hare entities in which she was either a shareholder, a partner, or a beneficiary, including Dairy (for which she was a shareholder and director), Hare & Hare (of which she was briefly a partner), and Isom's estate, Martha's estate, and the residuary trust (of which she was a beneficiary).[18] Nothing suggests that her roles set out above made her a client.

---

[17]Marcia also points us to the following evidence: (1) Bauer's invoice that indicated telephone conferences with Ralph regarding the preparation of the Agreement and warranty deeds; (2) testimony by Ralph that he discussed the change in the estate tax law and its consequences with Martha; (3) an entry in Ralph's time records that showed a conference with Martha, Mark, and Marcia on "4/23" with no indication of the year that conference took place; and (4) an affidavit by one of Marcia's attorneys that Ralph charged him for information regarding the Agreement and Martha's estate in 2017. Marcia does not explain how any of this evidence supports her contention that Ralph had an informal fiduciary relationship with her, and we find that this is no evidence of such a relationship.

[18]Marcia does not contend that Ralph owed her a fiduciary duty because of her status as shareholder, director, partner, or beneficiary.

In addition, there was no evidence that Marcia had any communications with Ralph regarding the work he performed for those entities or that she knew he performed any work for those entities before the December 31 meeting.

Also absent was any evidence that Marcia had ever relied on Ralph's advice or was accustomed to being guided by him in any matters before the December 31 meeting. To the contrary, Marcia's own testimony showed that she had been to Ralph's office on only a few occasions with her father and mother, that she could not remember ever asking him for any information, and that she had no domestic, social, or personal relationship with him, other than that he knew her family.[19]

On this record, we find that there was no evidence that Ralph or the Preuss Defendants had a formal or informal fiduciary relationship with Marcia that would give rise to a fiduciary duty. Therefore, we find that the trial court did not err in granting summary judgment on Marcia's breach of fiduciary duty claims asserted against the Preuss Defendants.

---

[19]Marcia points to *Kalb v. Nosworthy* in support of her argument that the Preuss Defendants had an informal confidential relationship with her. 428 S.W.2d 701 (Tex. App.—Houston [1st Dist.] 1968, no writ). However, *Kalb* is factually distinguishable. Unlike Marcia, Kalb was accountant Nosworthy's client, and all the work that Nosworthy performed was for Kalb: the evidence showed that Nosworthy had prepared Kalb's income tax returns and performed other accounting services for him for a period of ten years. *Id.* at 703–04. In addition, unlike this case, the evidence showed that Nosworthy and Kalb had a close personal relationship for at least ten years and that Kalb was accustomed to being guided by Nosworthy in legal and accounting matters. *Id.* at 703, 705.

*(2)*     *There Is No Evidence of an Injury or Damages Suffered by Marcia*

In their no-evidence motion for summary judgment, the Preuss Defendants asserted that there was no evidence of damages or injuries caused by them.[20]  That ground applies to all the causes of action asserted by Marcia against the Preuss Defendants.[21]

Marcia asserts that, due to the Preuss Defendants' allegedly wrongful acts and omissions, she was damaged by not receiving one-third of the residuary trust's real estate.  Specifically, she asserts that, as a result of the Preuss Defendants' alleged acts and omission, she was divested of her one-third interest in tracts C, E, F, G, H, J, K, L, M, P, and part of tract D.  In support of these assertions, Marcia points to (1) Isom's will; (2) the Agreement; (3) the warranty deeds from Mark, as trustee, Marcia, and Deaneth to Martha dated December 31, 2012; (4) the warranty deeds from Martha to Mark dated December 31, 2012, and March 29, 2013; and (5) the

---

[20]In their no-evidence motion for summary judgment, the Preuss Defendants asserted that there was no evidence of damages caused by them, without specifying which causes of action they were challenging.  In her response to the motion, Marcia complained of the lack of specificity in the motion but did not obtain a ruling on her complaint.  In her response, Marcia also acknowledged that this no-evidence point could apply to many of her claims.  On appeal, Marcia does not complain about the lack of specificity in the no-evidence motion for summary judgment, and she has addressed the no-evidence of damages or injuries issue regarding her statutory fraud, fraud by nondisclosure, civil conspiracy, and aiding and abetting Mark's breach of fiduciary duty claims.

[21]Each cause of action asserted against the Preuss Defendants requires a showing that Marcia suffered damages or injuries.  *See Bombardier Aerospace Corp. v. SPEP Aircraft Holdings, LLC*, 572 S.W.3d 213, 219–20 (Tex. 2019) (fraud by nondisclosure); *Parker*, 514 S.W.3d at 220, 222 (breach of fiduciary duty, civil conspiracy); *In re Guardianship of Patlan*, 350 S.W.3d 189, 200 (Tex. App.—San Antonio 2011, no pet.) (statutory fraud).  In her live pleading, Marcia also asserted a cause of action for aiding and abetting Mark in his alleged breach of his fiduciary duties.  While Texas recognizes a cause of action for joint tortfeasor liability when a party knowingly participates in a fiduciary's breach of its fiduciary duty, *Kinzbach Tool Co. v. Corbett-Wallace Corp.*, 160 S.W.2d 509, 514 (Tex. 1942), whether Texas recognizes a cause of action for aiding and abetting is still an open question.  *See Parker*, 514 S.W.3d at 224.  In her brief on appeal regarding aiding and abetting, Marcia cites both *Kinzbach* and *Parker* as authority.  Nevertheless, whether we construe the live pleadings as asserting a cause of action for aiding and abetting, or for joint tortfeasor liability, her cause of action seeks to hold the Preuss Defendants liable for assisting Mark in his alleged breach of fiduciary duty, which tort required a showing that Marcia suffered damages from that breach. *Id.* at 220.

19

warranty deed from Martha to Lacy, as trustee for Marcia Special Needs Trust, dated December 31, 2012.

Marcia asserts that, because she relied on Ralph's alleged misrepresentations and omissions, and because of the Preuss Defendants' other allegedly wrongful acts, she signed the Agreement and deeds, thereby divesting herself of her one-third interest in tracts C, E, F, G, H, J, K, L, M, P, and part of tract D. Since there is no summary judgment evidence that Marcia, individually, at any time owned an interest in those tracts, Marcia's theory of damages rests on the premise that, before December 31, 2012, the residuary trust owned those tracts, making her the beneficiary of a one-third interest under the terms of the trust. However, the summary judgment evidence does not show that the residuary trust owned any interest in those tracts on or before December 31, 2012.

The summary judgment evidence showed that, under the terms of Isom's will, the residuary trust was to be funded with property equal in value to the estate tax exemption in effect on the date of Isom's death, i.e., $675,000.00. All of Isom's residuary estate that was not placed in the residuary trust was devised to Martha. Isom's Inventory showed that all of Isom's estate consisted of community property that he owned with Martha. Martha, as executor of Isom's estate, was charged with funding the residuary trust, and she was authorized to distribute property to the trust "in kind, in money, or partly in each, without requiring pro rata distribution of specific assets."

The evidence showed that Martha funded the residuary trust with tracts B and S, 22,900 shares of Dairy, and $53,142.00 in cash. Under the terms of Isom's will, by funding the

20

residuary trust with tracts B and S, all the remaining assets in Isom's estate became vested in Martha, including Isom's one-half community property interest in tracts C, D, E, F, G, H, J, K, L, M, and P. Since Martha already owned the other one-half interest in those tracts, after the distribution to the residuary estate, she became the owner of the entire interest in those tracts. There was no evidence that Martha at any time transferred any of those tracts to the residuary trust. Consequently, even though Mark, as trustee of the residuary trust, and Marcia and Deaneth, individually and *pro forma*, executed warranty deeds on December 31, 2012, purporting to convey those tracts to Martha, there was no evidence that the residuary trust owned any interest in the tracts. Since there was no evidence that the residuary trust owned any interest in tracts C, D, E, F, G, H, J, K, L, M, and P, Marcia did not have a one-third beneficial interest, as beneficiary of the trust, in those tracts. As a result, Marcia could not have been injured by signing the warranty deeds.

Nor was there any evidence that Marcia was injured by signing the Agreement. The Agreement recited that Martha would execute warranty deeds conveying all of her interests in certain real properties to Mark, Marcia, and Deaneth, as more fully described in Exhibits D, E, and F.[22] In exchange for that consideration, and the parties' mutual covenants, the Agreement contained a mutual release of all actual and potential claims arising out of any claim in and to, or relative to, Isom's estate. As we previously noted, although Isom's will did not direct any specific property to be placed in the residuary trust, it contained a provision that, after Martha's death, the trustee was to distribute to Marcia tract D and part of tracts C and E. However, there

---

[22]Those exhibits do not appear in the appellate record.

21

was no evidence that Marcia ever filed a claim against Martha, as executor of Isom's estate, asserting that she was injured by Martha's failure to distribute tracts C, D, and E to the residuary trust. Further, in her live pleadings, Marcia has not asserted a cause of action against Mark, as trustee of Martha's estate, asserting any injury from Martha's failure to distribute those tracts to the residuary trust. Nor has she argued that, because of the Preuss Defendants' acts and omissions, she was barred from asserting those claims. As a result, there was no evidence that Marcia was injured by executing the Agreement.

On this record, we find that there was no evidence of damages or injuries caused by the acts or omissions of the Preuss Defendants.[23] Therefore, we find that the trial court did not err in granting summary judgment for the Preuss Defendants on Marcia's causes of action against them. We overrule this issue.[24]

For the reasons stated, we affirm the trial court's judgment.


Josh R. Morriss, III
Chief Justice


Date Submitted:     August 20, 2021
Date Decided:      October 29, 2021

---

[23]We also find on this record that, relative to Marcia's statutory fraud claim, there was no evidence of reliance; regarding her civil conspiracy claim, there was no evidence of any agreement between the Preuss Defendants and Mark to commit an unlawful act; and regarding her aiding and abetting claim, there was no evidence that the Preuss Defendants assisted or encouraged Mark to commit an unlawful act.

[24]Because those no-evidence grounds supported the trial court's summary judgment, we need not address Marcia's sub-issues regarding the grounds asserted for a traditional summary judgment and other no-evidence grounds. Also, because Marcia's issues regarding the denial of her motion for new trial and allegedly improper summary judgment evidence only relate to a ground asserted for a traditional summary judgment, we need not address them.